890 F.2d 698
 58 USLW 2369, Prod.Liab.Rep.(CCH)P 12,325
 Carol Anne KLEEMANN, Individually and as the Executrix and
Personal Representative of the Estate of Henry M. Kleemann,
as the Guardian of the minors Katherine M. Kleemann and
Michael Andrew Kleemann; Susan E. Seiden; S.S. Seiden,
Jr., Plaintiffs-Appellants,
v.
McDONNELL DOUGLAS CORPORATION, Defendant-Appellee.
Carol Anne KLEEMANN, Individually and as the Executrix and
Personal Representative of the Estate of Henry M. Kleemann,
as the Guardian of the minors Katherine M. Kleemann and
Michael Andrew Kleemann; Susan E. Seiden; S.S. Seiden,
Jr., Plaintiffs-Appellees,
v.
McDONNELL DOUGLAS CORPORATION, Defendant-Appellant.
 Nos. 89-2032, 89-2047.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 4, 1989.
Decided Dec. 6, 1989.
Rehearing and Rehearing In Banc Denied Dec. 29, 1989.
 
 Robert Sibley Cooper, Jr., for plaintiffs-appellants.
 Thomas C. Walsh (Douglas E. Winter, Robert W. Shely, Bryan, Cave, McPheeters & McRoberts; George L. Russell, Jr., Robert J. Mathias, Piper & Marbury, on brief), for defendant-appellee.
 Before WILKINSON, Circuit Judge, HAYNSWORTH,* Senior Circuit Judge, and WILLIAMS, United States District Judge for the Eastern District of Virginia, sitting by designation.
 WILKINSON, Circuit Judge:
 
 
 1
 To avoid liability for accidents involving military equipment, military contractors are required to show, inter alia, that their products conformed to reasonably precise specifications approved by the United States. Boyle v. United Technologies Corp., 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). Here we must decide what conformity means. Plaintiffs allege that the landing gear of an F/A-18 aircraft, in which plaintiffs' decedent was killed, did not conform to general performance requirements contained in defendant's original contract with the Navy. We cannot, however, equate as a matter of law a failure of performance with an absence of conformity. Nor do the precatory goals developed for a product at the start of the procurement process establish the "reasonably precise specifications" to which the product must conform. Because the landing gear plainly did not deviate from the ultimate design required by the Navy in the whole of its negotiations with the contractor, we uphold the grant of summary judgment for defendant and affirm the applicability of the government contractor defense to this case.
 
 I.
 
 2
 On December 3, 1985, Captain Henry M. Kleemann, a U.S. Navy pilot, was killed when his F/A-18 aircraft went out of control during landing, left the runway, and overturned. Defendant McDonnell Douglas Corporation (MDC) had designed the F/A-18 for the Navy. The Navy concluded that Captain Kleemann's accident was caused, in part, by failure of the planing link assembly on the main landing gear. The planing link assembly was designed to assist folding and unfolding the wheel assemblies into and from the wheel well and to lock the wheels appropriately for takeoff and landing. It allows the wheels to "deplane," or move out of line with the direction of the aircraft, during retraction and extension of the landing gear.
 
 
 3
 Kleemann's surviving spouse and children brought a diversity action in the district court of Maryland claiming that the plane was negligently and defectively designed by McDonnell Douglas. Plaintiffs contended that the landing gear did not conform to reasonably precise specifications contained in the Navy's original contract with MDC. Specifically, they alleged that the landing gear failed to meet the requirement that it withstand normal landing loads without bending, unlocking or causing uncontrolled motion of the aircraft (citing SD-24K-Volume I, and Military Specification MIL-A-8863A).
 
 
 4
 Defendant, on the other hand, argued that the specifications proffered by plaintiff were not the "reasonably precise specifications" required by Boyle, because such general requirements do not tell the contractor what to build and how to design the product. MDC contended that the accident aircraft incorporated all Navy-approved landing gear designs and modifications through the date of delivery. As such, the landing gear conformed to all precise, quantitative specifications which evolved out of the continuous exchange between MDC and the Navy.
 
 
 5
 The district court held that the operative question was whether the product conformed to the "ultimate design specifications," not to qualitative, precatory specifications used in the procurement process. The court concluded that plaintiffs had not presented evidence that the landing gear on the accident aircraft deviated from the ultimate design specifications approved by the Navy. It granted defendant's motion for summary judgment, and this appeal followed.[1]
 
 II.
 
 6
 We review at the outset the elements of the government contractor defense. Under Boyle v. United Technologies Corp., 487 U.S. 500, 108 S.Ct. 2510, 2518, 101 L.Ed.2d 442 (1988), a contractor is not liable for design defects in military equipment when: (1) the United States approved "reasonably precise specifications;" (2) the equipment conformed to those specifications; and (3) the contractor warned the government about any dangers in the use of the equipment that were known to the contractor but not to the government.
 
 
 7
 Plaintiffs' claim is precisely the sort for which the defense was intended. This is true both because of the nature of defendant's product and the characteristics of the process by which it was designed. At issue here is a discretionary decision involving military hardware in which the government was a substantial participant. See Boyle, 108 S.Ct. at 2517. The F/A-18 aircraft was part of a broad defense initiative involving the Navy's deployment of a new "CV" class of aircraft carrier. The "CV" carrier had multi-mission capabilities as compared to older, more specialized counterparts. The F/A-18 was designed to provide support for the new carrier, and to replace with a single aircraft the Navy's clear weather fighters and all-weather fighters. It is hard to imagine a matter more uniquely in the province of the military--and one less appropriate to second-guessing by civilian courts--than the development of a high technology, multi-mission aircraft. See id. at 2517-18.
 
 
 8
 Similarly, the design details of the F/A-18 illustrate the balancing of military and technological factors, including "the trade-off between greater safety and greater combat effectiveness." Id. at 2517. For example, the main landing gear at issue here had to absorb extremely high amounts of energy generated upon landing on a carrier. On the other hand, stowage of the gears could not interfere with external weapon storage. These competing concerns required a unique "levered gear" design to provide adequate distance between the extended right and left main landing gears and thereby ensure stability of the aircraft upon landing. The design, developed by MDC and approved by the Navy, employed a planing link assembly to deplane the wheels during retraction and extension of the landing gear.
 
 
 9
 The design and production of the F/A-18 also illustrate the exchange of views in the procurement process between military officials and the private contractor. See Harduvel v. General Dynamics Corp., 878 F.2d 1311, 1320 (11th Cir.1989); Tozer v. LTV Corp., 792 F.2d 403, 407 (4th Cir.1986). Beginning with bids for what would become the F/A-18, teams of Navy engineers met with each contractor for extended discussions of their submissions. When the Navy selected MDC to develop and build the F/A-18, the final design contracts for the aircraft incorporated MDC's original proposal as modified during extensive negotiations between the parties. During design development, MDC was required to submit detailed engineering drawings to the Navy for approval. All changes to the design or specifications of the aircraft required Navy approval, including proposals to address problems with the allegedly defective landing gear. The government also maintained an extensive staff of aircraft engineers on site at MDC's facilities in St. Louis.
 
 
 10
 It is this salient fact of governmental participation in the various stages of the aircraft's development that establishes the military contractor defense. Indeed, active governmental oversight is relevant to all three elements of defendant's burden. Where, as here, the Navy was intimately involved at various stages of the design and development process, the required government approval of the alleged design defect is more likely to be made out. See Ramey v. Martin-Baker Aircraft Co., 874 F.2d 946, 950-51 (4th Cir.1989); Dowd v. Textron Inc., 792 F.2d 409, 412 (4th Cir.1986). Similarly, the Navy's extensive participation, including reservation of the power to approve or disapprove design modifications, enhances the likelihood of final product conformity. Government involvement in the process also makes it more likely, though not certain, that a sharing of information will occur with respect to potential dangers in the use of the equipment. As a final matter, extensive governmental participation provides tangible evidence of the strong federal interest which justifies the creation of a federal common law defense for government contractors in the first place.
 
 III.
 
 11
 Plaintiffs argue nonetheless that the government contractor defense does not apply because the main landing gear of decedent's F/A-18 failed to conform to the government's "reasonably precise specifications" as required by Boyle. There is no evidence, however, that the landing gear failed to conform to the precise quantitative specifications embodied in the totality of documents exchanged between the parties.[2]
 
 A.
 
 12
 Plaintiffs contest the district court's conclusion that ultimate design specifications are most relevant to the government contractor defense. They contend that the reasonably precise specifications for the main landing gear of the F/A-18 are contained in "Detail Specification for Model F/A-18 Aircraft" (SD-565-1-4), certain incorporated provisions from the Navy aircraft manual (SD24-K Volume I-General Specification For Design and Construction of Aircraft Weapon Systems), three relevant incorporated Military Specifications (MIL-A-8860, 8863A and 8866), and Procurement Specification 74-410051. Plaintiffs allege that these documents require that the landing gear be strong enough to withstand normal landing loads without bending, that it remain locked after extension until unlocked from the cockpit, and that any failure of the landing gear not result in uncontrollable movement of the airplane.
 
 
 13
 We do not dispute that the documents referenced by plaintiffs embody part of the universe of specifications to which the landing gear must conform. However, plaintiffs fail to appreciate that military hardware does not suddenly spring into being from initial design and procurement specifications, but evolves through drawings, blueprints and mockups agreed upon by the parties. See Harduvel, 878 F.2d at 1320-21; Ramey, 874 F.2d at 948 n. 4-5. The ultimate design of the product is determined not only by the original procurement and contract specifications, but also by specific, quantitative engineering analysis developed during the actual production process.
 
 
 14
 Indeed, many of the documents cited by plaintiffs reflect no more than the initial, theoretical phase of the development of the F/A-18 landing gear. The general qualitative specifications contained therein were incorporated by reference into the full scale development contracts issued to MDC for the development of the F/A-18. As part of its duties under the contract, MDC used the Navy specifications to develop required structural load parameters which served as a basis for the detailed design of the aircraft. These design loads comprised five volumes of material which were submitted to the Navy. The contract also required MDC to submit detailed design drawings to the Navy for approval as the general specifications became embodied in the actual landing gear. The Navy reserved the right to reject drawings and to require revisions and modifications. These working drawings, and not simply the general qualitative specifications from the procurement stage, comprise "the reasonably precise specifications" contemplated by Boyle.
 
 
 15
 Where the military procurement process involves this kind of continuous exchange between the contractor and the government, the process itself becomes persuasive evidence of product conformity to precise specifications. Here the government maintained discretion over the design of the product throughout; it did not simply turn over such discretion, and the military decisions inherent therein, to the private contractor. In contrast to the Fifth Circuit's conclusion in Trevino v. General Dynamics Corp., 865 F.2d 1474, 1487 n. 13-14 (5th Cir.1989), that there had been inadequate review of the design drawings to make out the defense, the Navy here performed extensive review of detailed design drawings submitted by MDC. The Contract Data Requirements List, which laid out required document submissions under the contract, specifically required that Landing Gear Design Reports and Landing Gear Specifications be submitted for Navy review and approval. Moreover, Navy engineers and other personnel participated in the F/A-18 design process through periodic design review meetings including Detail Design Review meetings, Technical Coordination meetings, F/A-18 Specialty Design Reviews, Program Management Reviews, Flight Test Readiness Reviews, and Production Readiness Reviews. Such meetings, of course, bolster the underpinning of the defense, namely that the contractor should not be held liable at law for performing the government's bidding. See Boyle, 108 S.Ct. at 2518.
 
 
 16
 It is also undisputed that the Navy exercised complete discretion over suggested design changes in connection with the landing gear design. Between 1979, when F/A-18 test flights began, and 1985, the Navy expressly approved or required a substantial number of landing gear design modifications and rejected others, as evidenced by the Safety Action Record maintained by MDC. For example, in 1983 the Navy declined to implement an MDC proposal for an improved planing link that incorporated a coiled spring design. MDC believed this design would offer greater resistance to the buckling of the planing link. On the other hand, the Navy accepted a proposed modification in 1984 which incorporated a hydraulic restrictor designed to protect the planing link from bending due to excessive torque forces. (Several years later, the Navy did incorporate a coiled spring design similar to the type MDC had proposed in 1983.)
 
 
 17
 Plaintiffs' reference to the general failure of F/A-18 landing gear to withstand normal landing loads without bending or unlocking fails to take into account this significant history. Requirements such as an ability to withstand normal loads and prohibitions against operational failures represent little more than the hopes of participants that the project on which they are about to embark will turn out well. General qualitative specifications must be distinguished from the "detailed, precise and typically quantitative specifications for manufacture of a particular military product." Shaw v. Grumman Aerospace Corp., 778 F.2d 736, 745 (11th Cir.1985). These two broad types of specifications often overlap and may even be at cross purposes--for example, design specifications for a complex back-up system may conflict with the qualitative requirements of ease of maintenance, combat effectiveness or cost containment. Id. at 745. Only the detailed, quantitative specifications--and not those calling for such vagaries as a fail-safe, simple or inexpensive product--are relevant to the government contractor defense.
 
 
 18
 In essence, plaintiffs' argument is that the ultimate design of the landing gear failed to produce an aircraft that performed perfectly. Plaintiffs' view would render the government contractor defense illusory. Nonconformance to precise specifications must mean more than that the design does not work in compliance with some "general admonition against an unwanted condition." Harduvel, 878 F.2d at 1319 n. 3. A product involved in a design-induced accident would, as a definitional matter, always be deemed not to comply with such generalities since no performance specifications approved by the government would purposely allow a design that would result in an accident. In fact, plaintiffs describe exactly the situation in which the government contractor defense does apply: when the required ultimate military design fails to produce a "reasonably safe" product under state law. Contrary to plaintiffs' assertions, a product conforms to reasonably precise specifications if it satisfies "an intended configuration" even if it "may produce unintended and unwanted results." Id. at 1317. The evidence demonstrates that the alleged defect inhered in the unique design of the landing gear itself--as required by the Navy--and did not result from any deviation from the required military specifications.
 
 B.
 
 19
 Plaintiffs further allege that the Navy had itself concluded that the landing gear did not conform to specifications. They rely upon a Notice of Defect issued by the Navy to MDC in November 1983, in connection with the recurring problem of bending of the planing link assembly on the main landing gear of the F/A-18.
 
 
 20
 Plaintiffs' argument fails for several reasons. First, the very purpose of the government contractor defense is to encourage active communication between suppliers of military equipment and military authorities in the development and testing of equipment. McKay v. Rockwell Int'l Corp., 704 F.2d 444, 450 (9th Cir.1983). This cooperative effort must include identification by the parties of actual and potential problems during design and production. If a mere notification of defect precluded application of the government contractor defense, the climate of candid exchange between the government and the contractor would be compromised.
 
 
 21
 Second, it is undisputed that MDC addressed the problem of the bent planing links in response to the Notice of Defect. In early 1984, MDC and the Navy mutually concluded that the hydraulic system of the aircraft allowed the landing gear to rotate into stowage before the wheel stopped spinning, exposing the planing link to torque forces in excess of design specifications. In response, MDC designed a "hydraulic restrictor" to slow the rotation of the gear after takeoff and before stowage. The Navy approved the design of the hydraulic restrictor and directed that it be incorporated into all new production models, including the aircraft that Kleemann was flying at the time of the accident. On May 24, 1985, the Navy advised MDC that the Notice of Defect was formally closed.
 
 IV.
 
 22
 In sum, we find no evidence that the landing gear deviated from the configuration which was proposed by the Navy and reduced to precise specification by the continuous back and forth exchange between the Navy and MDC. The judgment of the district court is therefore
 
 
 23
 AFFIRMED.
 
 
 
 *
 Judge Haynsworth participated in the consideration of this case but died prior to the time the decision was filed. The decision is filed by a quorum of the panel. 28 U.S.C. Sec. 46(d)
 
 
 [1]
 The district court also denied a motion to dismiss filed by defendant on the grounds that the action was barred by California's one-year statute of limitations for wrongful death claims. The court found that Maryland's three-year statute of limitations applied, and we decline to disturb its decision
 
 
 [2]
 Plaintiffs in their opposition to summary judgment below appear to dispute only whether the landing gear conformed to reasonably precise specifications. However, we are persuaded by our review of the evidence that the Navy also approved those specifications. Further, there is no evidence that MDC failed to warn the Navy of dangers in the design of the landing gear that were unknown to the government