Patricia LANDGRAF, Executrix of
the Estate of Jerome Landgraf,
Plaintiff–Appellant,

v.

McDONNELL DOUGLAS HELICOPTER
COMPANY, et al., Defendants–
Appellees.

No. 92–5631.

United States Court of Appeals,
Sixth Circuit.

Argued March 1, 1993.

Decided May 13, 1993.

Rehearing and Rehearing En Banc
Denied July 8, 1993.

J. Daniel Kemp, Dixon & Kemp, Hopkins-
ville, KY, and Jack R. Dodson, Jr. (briefed)
and Charles M. Merkel (argued), Merkel &
Cocke, Clarksdale, MS, for plaintiff-appel-
lant.

Richard C. Roberts, Whitlow, Roberts,
Houston & Russell, Paducah, KY, and
George McCall and Christopher S. Kilgore
(argued and briefed), Kern & Wooley, Irving,
TX, for defendants–appellees.

Before: JONES and NELSON, Circuit
Judges; and LIVELY, Senior Circuit Judge.

LIVELY, Senior Circuit Judge.

In this wrongful death action by the widow
of an Army chief warrant officer who was
killed in a helicopter crash, the district court
granted the helicopter manufacturer's motion
for summary judgment on the basis of the
"government contractor defense" recognized
by the Supreme Court in *Boyle v. United
Technologies Corp.*, 487 U.S. 500, 108 S.Ct.
2510, 101 L.Ed.2d 442 (1988). The question
for us is whether a pre-existing Military
Specification (MIL–S), which was incorporat-
ed by reference in the Detail Specification for
the helicopter involved in the fatal crash,
constituted a "reasonably precise specifica-
tion" that the manufacturer was required to
meet. In an unpublished opinion, the district
court held that the MIL–S was not part of
the "ultimate design specifications" for the
helicopter; instead, the court treated the
MIL–S requirements as part of a " 'general
admonition against an unwanted condition.' "
(quoting *Kleemann v. McDonnell Douglas
Corp.*, 890 F.2d 698, 703 (4th Cir.1989) (cita-
tion omitted)).

The parties agree that the Army provided
reasonably precise specifications for the air-
craft, but disagree as to whether such specifi-
cations consisted only of requirements in the
Detail Specification or those requirements
plus those contained in the incorporated ma-

terials, including this particular MIL–S. The ultimate question of whether the helicopter conformed to reasonably precise specifications depends on our determination of what constituted the "reasonably precise specifications."

## I.

The helicopter involved in the accident, serial number 68–17276, was manufactured by Hughes Tool Company, Aircraft Division, now McDonnell Douglas Helicopter Company. A light observation helicopter, designated by the Army as model OH–6A, it had been built in 1969. The Army later modified the aircraft into an attack helicopter, known as a model AH–6C.

### A.

On May 20, 1988, the helicopter crashed during a training flight in the area of Fort Campbell, Kentucky. The plaintiff's decedent, Jerome Landgraf, was aboard as a technical observer. Eyewitnesses testified that the helicopter appeared to have lost power, and some said the aircraft appeared to veer sharply to the right as it descended. The speed of the main rotor dropped sharply and one of the main rotor blades struck the tail boom and severed it. The helicopter then fell the final 100 feet of its descent and crashed violently. Neither the pilot nor Landgraf survived.

The record does not contain any evidence other than opinion testimony concerning the airspeed before the helicopter began erratic movements or the actual speed of the main rotor either then or at the time it came into contact with the tail boom.

### B.

Patricia Landgraf filed this action as executrix of her husband's estate, seeking damages under Kentucky law. The district court had jurisdiction based on diversity of citizenship of the parties. McDonnell Douglas supported its motion for summary judgment with affidavits and exhibits. The plaintiff sought to avoid summary judgment by relying on the deposition of her expert witness as well as documents filed by the defendant and some statements of the defendant's witnesses.

The district court concluded that the plaintiff had failed to carry her burden under present-day summary judgment practice to identify genuine issues of material fact after the defendant supported its motion with evidence from which the court could find that the government contractor defense applied to this case. On this basis the district court held that McDonnell Douglas was entitled to judgment as a matter of law. FED.R.CIV.P. 56(c).

## II.

In *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), the Supreme Court held that federal law displaces state law in areas of " 'significant conflict' " between an "identifiable 'federal policy or interest and the [operation] of state law' " when state law acts to " 'frustrate specific objectives' " of federal legislation. *Id.* at 507, 108 S.Ct. at 2516 (alteration in original) (citations omitted). This condition may exist where state tort law holds a government contractor liable for design defects in military equipment manufactured in compliance with "reasonably precise specifications" imposed by the government. The theoretical support for this defense lies in the fact that if the injured party sought recovery from the government under the Federal Tort Claims Act, rather than from the contractor, the government would prevail under the "discretionary function exception" to that Act's waiver of immunity. *Id.* at 511–12, 108 S.Ct. at 2518–19. If a contractor were held liable under facts which would have brought an FTCA claim within the discretionary function exception, the government's immunity would be largely illusory. Such liability would "directly affect the terms of Government contracts." *Id.* at 507, 108 S.Ct. at 2516.

To escape liability under state law for design defects in military equipment on the basis of this defense, a contractor must establish three conditions: "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the

use of the equipment that were known to the supplier but not to the United States." *Id.* at 512, 108 S.Ct. at 2518.

As the court pointed out in *Harduvel v. General Dynamics Corp.,* 878 F.2d 1311 (11th Cir.1989), *cert. denied,* 494 U.S. 1030, 110 S.Ct. 1479, 108 L.Ed.2d 615 (1990), "[t]he three conditions serve to ensure that the defense operates to immunize the contractor only where the government has actually participated in discretionary design decisions, either by designing a product itself or approving specifications prepared by the contractor." *Id.* at 1316. It is only under these circumstances that the contractor shares the government's immunity. The opinion was written by Supreme Court Justice Lewis Powell, sitting by designation, who concluded his discussion of the government contractor defense with this observation:

> Although the defense may sometimes seem harsh in its operation, it is a necessary consequence of the incompatibility of modern products liability law and the exigencies of national defense.

*Id.* at 1322.

The district court found support for its decision to grant McDonnell Douglas summary judgment in *Kleemann v. McDonnell Douglas Corp.,* 890 F.2d 698 (4th Cir.1989), *cert. denied,* 495 U.S. 953, 110 S.Ct. 2219, 109 L.Ed.2d 545 (1990). *Kleemann* resembles the present case in many ways. There the plaintiffs' decedent was killed in the crash of a Navy fighter aircraft as it landed. The Navy concluded that the accident was caused, at least in part, by failure of a part of the landing gear. The plaintiffs alleged that the landing gear failed to meet a Military Specification requirement that it withstand normal landing loads without causing uncontrolled motion of the plane. The defendant in *Kleemann* argued that the requirement in the Military Specification was not a "reasonably precise requirement" referred to in *Boyle.* The district court agreed and granted summary judgment for the defendant.

The court of appeals affirmed, distinguishing between quantitative specifications that detail particular requirements to be met in manufacturing military hardware and "general qualitative specifications" promulgated during early stages of procurement. *Id.* at 702. The court concluded that general requirements on the "ability to withstand normal loads and prohibitions against operational failures represent little more than the hopes of participants that the project on which they are about to embark will turn out well." *Id.* at 703. Further, the court stated that "a product conforms to reasonably precise specifications if it satisfies 'an intended configuration' even if it 'may produce unintended and unwanted results.'" *Id.* (quoting *Harduvel,* 878 F.2d at 1317).

Throughout its opinion, the *Kleemann* court emphasized the long exchanges of views between the Navy and the contractor, treating continuous government participation throughout the procurement process as the "salient fact" in establishing the government contractor defense. 890 F.2d at 701. In *Stout v. Borg–Warner Corp.,* 933 F.2d 331 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 584, 116 L.Ed.2d 609 (1991), the court adopted the same approach. Affirming summary judgment for the defendant contractor, the *Stout* court found that rather than rubber-stamping the contractor's "reasonably precise design drawings," the Army thoroughly reviewed and critiqued the contractor's work at various stages of design and testing and thoroughly evaluated actual performance over a period of months. *Id.* at 336.

### III.

The parties' arguments address the issues as framed in the decisions described above.

### A.

The plaintiff agrees that McDonnell Douglas established the first and third requirements for the contractor defense. She argues, however, that the defendant failed to establish the second condition—that the helicopter conformed to the reasonably precise specifications. She points out that the defendant concedes that the Detail Specification for OH–6A incorporated MIL–S–8698 by reference. The incorporating language, contained in paragraph 2.1 of the Detail Specification reads as follows:

2.1 Applicable Documents. The following documents ... shall form a part of the Specification, in their entirety, except as limited in subsequent paragraphs and except for any deviations thereto which are set forth in Appendix II....

Among the documents listed was MIL–S–8698, Structural Design Requirements, Helicopters, dated 1 July 1954. Paragraph 3.6.5.3, captioned *Rotor blade clearance,* as pertinent here, reads as follows:

The design of the rotor system(s) shall be such that, upon installation on the helicopter, there shall be sufficient clearance of the blades to the ground, to each other, and to other parts of the helicopter.... During operation in all flight regimes, the clearance between main rotor blades and other parts of the helicopter shall not be less than 9 inches, and preferably 12 inches.... The design of the rotors shall be such as to preclude the possibility of the blades striking each other or any part of the helicopter....

The plaintiff argues that even though the Army approved the Detail Specification and accepted delivery of OH–6As, insofar as McDonnell Douglas failed to meet the requirements of the incorporated MIL–S, the helicopter did not conform. If the defendant determined that it was impossible to design a helicopter that met the clearance requirements of the incorporated specifications, it had two options, according to the plaintiff. McDonnell Douglas could either have declined to build the OH–6A or it could have sought a deviation from this requirement. Appendix II contains 43 pages of deviations, but none relate to MIL–S–8698 ¶ 3.6.5.3.

Distinguishing *Kleemann,* the plaintiff contends that the incorporated specifications in this case are not "general" or "qualitative." On the contrary, she insists, a specification that requires a helicopter so designed "as to preclude the possibility of the [rotor] blades striking each other or any part of the helicopter," and then establishes clearance minimums of "not less than 9 inches, and preferably 12 inches," is most specific and "quantitative."

The plaintiff denies that the Army's acceptance of OH–6A helicopters from the defendant proves conclusively that the helicopters conformed to all reasonably precise specifications. If that were so, all other evidence would be redundant; a manufacturer whose equipment is accepted would automatically be clothed with immunity. Rather than granting summary judgment to the defendant, the plaintiff contends that the district court should have submitted to the jury the question whether the incorporated requirement is a "reasonably precise specification."

## B.

McDonnell Douglas argues that the plaintiff failed to meet her burden of pointing to evidence that establishes the existence of genuine issues of material facts. An expert's assertion in an affidavit in support of summary judgment that the "governing" specifications are contained in the Detail Specifications while the incorporated MIL–S contains "lower tier specifications" is uncontradicted. In addition, when there is conflict between the Detail Specification and such lower tier specifications, according to the affidavit, the Detail Specification always controls.

The truth of the affiant's statements, the defendant maintains, is shown by a number of undisputed facts. First, MIL–S–8698 was promulgated before the OH–6A aircraft was proposed. The Military Specification contains a "general and generic" set of criteria that refers to all types of helicopters, not this specific model, which is a single engine, single main rotor, light observation helicopter. (Portions of the specifications which we deleted for clarity, do refer to "multirotor configurations.") Second, as each OH–6A was delivered, the Army checked it against the Detail Specifications, not against general specifications, before accepting it. Third, while MIL–S–8698 ¶ 3.6.5.3 contains some specific details (9 to 12 inch clearance), taken as a whole it is only a precatory statement of the Army's goal of obtaining helicopters that are safe from rotor blade/tail boom contact in normal flying conditions. When a helicopter goes into "autorotation," a descent without power, there is always a possibility that the rotor blades will begin to flap and strike other parts of the aircraft.

McDonnell Douglas relies on the years of continuous contact between it and the Army during the procurement, prototype testing and production phases of the OH–6A as evidence that it is entitled to rely on the government contractor defense. The Army conducted its own inspections and test flights and had technical personnel in the plant monitoring the defendant's performance during production. The design of the rotor system referred to its placement, dimension and construction—all precisely prescribed in the Detail Specification. Finally, McDonnell Douglas argues that the Army's approval of the final design for the OH–6A and its issuance of a conformity certificate for serial number 68–17276, the helicopter in which CWO Landgraf was a passenger, constituted the exercise of discretion. It is this discretionary function that shields the contractor from tort liability.

At oral argument the plaintiff refuted the defendant's claims of a "governing" vs. "lower tier specifications" dichotomy. Counsel insisted that the MIL–S–8698 specifications are binding and that McDonnell Douglas was bound to conform to them or obtain a deviation. Also, for the first time, counsel suggested that the unusual conditions at the time of the crash made this a case for the jury.

In response the defendant repeated its contention that only the Detail Specification contained the mandatory design requirements for the OH–6A model. With respect to the situation immediately before the crash, the defendant argued that the undisputed evidence of the helicopter's loss of power and autorotation established conditions so far outside the "design parameters" of the aircraft that normal functions could not be maintained.

## IV.

This case differs in· some respects from any other we have seen dealing with the government contractor defense. If it were controlled by strict contract principles, it would be hard to sustain the defendant's position. The language incorporating MIL–S–8698 appears to be clear and unqualified. As such, under contract law, its contents would be binding on McDonnell Douglas unless they conflicted with provisions of the Detail Specification, and there appears to be no conflict. We are convinced, however, that the Army's actions throughout the procurement process support the defendant's claim that the provisions of MIL–S–8698 did not govern the design of model OH–6A.

### A.

■ We review an order granting summary judgment *de novo*. There is no contradiction in the evidence relating to the procurement, design, testing and acceptance of the OH–6A model helicopter by the Army. Hughes submitted the Detail Specification for the helicopter to the Army in 1965 following several years of planning, the delivery of prototype aircraft and testing by both the FAA and the Army. The Detail Specification contained many changes in the original design that resulted from exhaustive testing. The Army's testing was concerned with mission performance and reliability. Even after the Army awarded the contract, it continued flight testing during production. The undisputed affidavit of the expert witness Crawford, who oversaw development of contract technical specifications for the Army's light observation helicopters, states that once the Hughes bid was accepted, no changes could be made in the specifications except as directed by the Army in writing. Crawford also managed the development of the OH–6A from 1966 to 1988. According to Crawford, each OH–6A was "progressively and continuously" inspected by the Army throughout production, and no craft could be certified as completed by the manufacturer until it had been checked against the Detail Specification and approved by Army inspectors at the plant.

The expert witness Leib, who headed Hughes' test program during the relevant time, stated in his affidavit that before production began Hughes built and delivered seven prototypes of model OH–6A to the Army for testing. This testing by the Army involved hundreds of hours of flying and led to many design changes before publication of the Detail Specification in 1965. Continuing testing after award of the bid, the Army in

February 1966 called for a product improvement program for the OH–6A. The Army incorporated some design changes following this investigation of ways to improve the mission capability of the helicopter and reduce its operating costs.

Leib also stated that in July and August 1969, additional tests were conducted at the Army's request to evaluate possible effects of "control motion and subsequent main rotor blade motion on the tailboom." These tests were in response to an incident in which the main rotor of an Army helicopter struck the tail boom at the termination of a power-off landing (autorotation) during testing. There was no rotor blade/tail boom contact during these 1969 tests, although the main rotor blade came within three inches of the tail boom during one landing simulating severe conditions that exceeded "normal pilot technique."

Although these tests demonstrated that under normal rotor/airframe alignment, the rotor blades would not strike the tail boom even following severe control movements, Hughes recommended additional testing to investigate the matter further. The record contains no response to this request. As noted, the Army continued to certify model OH–6A as conforming and to accept aircraft, including the helicopter that crashed nearly 20 years after its delivery and acceptance in August 1969.

## B.

The plaintiff produced no proof in contradiction of the evidence recited above. She placed principal reliance upon the deposition of the expert Cochran as demonstrating the existence of genuine issues of material fact. This witness testified, however, that the rotor on a single main rotor helicopter could strike the body of the aircraft on most of the helicopters he was familiar with, and he was not aware of any helicopter on which a rotor strike could not potentially occur. The probability of a strike occurring was less on some models than others, he stated, and changing the design could "lessen the vulnerability" for such a strike.

Although she refers to issues of material fact, the true thrust of the plaintiff's argument appears to be that, as a matter of law, McDonnell Douglas was not entitled to judgment on the basis of the government contractor defense. She relies on the documentary evidence with admissions by the defendant and its experts that MIL–S–8698 was incorporated into the Detail Specification. She argues that having failed to obtain a deviation from the incorporated specifications, which the plaintiff contends are "reasonably precise," McDonnell Douglas failed to conform to the design approved by the Army and thus cannot rely on the defense.

## C.

We conclude that the district court properly granted summary judgment in favor of the defendant. Although it is not clear form the record exactly what caused the helicopter's erratic movements prior to the main rotor's striking the tail boom, the somewhat different observations of the eyewitnesses did not raise a material issue of fact. It is undisputed that the fatal crash was caused by the striking and severing of a portion of the tail boom. The question is whether the fact that this event occurred during an autorotational landing raised an issue of fact whether the OH–6A failed to conform to Army-approved design specifications for the single engine, single main rotor, light observation helicopter that Hughes contracted to build.

Our study of the record leads to the conclusion that the Army was aware of the danger that a rotor blade could strike the tail boom of a helicopter during unusual conditions. An Army report dated May 1967 on continued engineering flight tests of the OH–6A conducted at Edwards Air Force Base, California, discussed autorotational descents and landings. The report and the pre–1988 Army's Operator's Manual for OH–6A both contain warnings about the necessity for care during autorotational operation. When the Army authorized the additional tests to investigate rotor/tail boom clearance in 1969, its request to Hughes to conduct these tests stated:

> The final result of this effort will be the determination of possible changes to the OH–6A configuration leading to a reduction in the probability of tail boom strikes.

The Army apparently did not believe there could be a complete elimination of the probability of such strikes, only a reduction in that probability.

Although Hughes reported to the Army that there was a clearance of as little as three inches in one or more of the simulated autorotational landings—not the 9 to 12 inches mentioned in MIL–S–8698—the Army ordered no further changes in the configuration. This is strong evidence that the Army considered the contents of MIL–S–8698 as stating a desirable goal and a recommended way of achieving it, but not precise specifications. We do not believe the Army treated the MIL–S–8698 as formulating mandatory requirements. By permitting production to continue without any change in design following the 1969 tests, the Army made a discretionary decision to not insist on the clearance recommended in MIL–S–8698. Regardless of the original purpose of incorporating that specification into the governing document for the OH–6A, by acquiescing in the continued production without change and acceptance and certification of helicopters produced thereafter, the Army treated MIL–S–8698 as a precatory statement.

Our decision does not mean that whenever the government cooperates closely with a contractor in the design and development of military equipment and approves the equipment after testing the second prong of the *Boyle* test is satisfied, regardless of the language used in the contract. Nor should this opinion be read as recognizing a "lower tier/higher tier" distinction among requirements in military contracts. We hold only that the facts in this case establish that no design has produced a helicopter, in which the main rotor can never strike the tail boom under any set of conditions. The fact that MIL–S–8698 ¶ 3.6.5.3 was adopted twelve years before planning for the OH–6A began and was addressed to many different helicopters reenforces our conviction that it was a precatory statement only. When Hughes conducted the simulated landing tests that produced only a three inch clearance, the Army did not order additional testing or design changes. This was an exercise of discretion.

*Boyle* makes clear that the government contractor defense is intended to protect military contractors from state tort liability when they produce equipment conforming to design specifications adopted by government agencies in exercise of their discretion. This is such a case. We agree with the interpretations of *Boyle* reached by the *Harduvel* and *Kleemann* courts as well.

The judgment of the district court is affirmed.

NATHANIEL R. JONES, Circuit Judge, dissenting.

In the majority opinion, Judge Lively has thoughtfully and thoroughly presented the issue raised on this appeal. Though I consider it a close question, I am not convinced that the record conclusively shows that the Army acquiesced in a Detail Specification which would permit the main rotor blade to chop off the tail boom. Since I believe that Plaintiff–Appellant Patricia Landgraf has raised a genuine issue as to whether MIL–S–8698 ¶ 3.6.5.3 was a "reasonably precise specification" accepted by the United States, I would reverse the district court's grant of summary judgment and remand the case so that this matter might be resolved by the trier of fact. *Cf. Boyle*, 487 U.S. at 514, 108 S.Ct. at 2519 ("It is somewhat unclear from the Court of Appeals' opinion ... whether it was in fact deciding that no reasonable jury could ... have found for the petitioner on the facts presented, or rather was assessing on its own whether the [government contractor] defense had been established. The latter ... would be error, since whether the facts establish the conditions for the defense is a question for the jury.").

As pointed out in Judge Lively's opinion, MIL–S–8698 ¶ 3.6.5.3 was incorporated by reference into the Detail Specification for the helicopter in question. MIL–S–8698 ¶ 3.6.5.3 was extremely specific and quantitative in its discussion of main rotor blade-tail boom interaction:

The design of the rotor system(s) shall be such that, upon installation on the helicopter, there shall be sufficient clearance of the blades to the ground, to each other, and to other parts of the helicopter....

*During operation in all flight regimes,* the clearance between the main rotor blades and other parts of the helicopter *shall not be less than 9 inches,* and preferably 12 inches.... The design of the rotors *shall* be such as to *preclude the possibility* of the blades striking each other or any part of the helicopter.

(Emphasis added.)

Morton I. Leib, an employee of the Aircraft Division of the Hughes Tool Company/McDonnell Douglas from 1961 to 1991 and one intimately familiar with the design, testing, approval and production of the OH–6A having managed the OH–6A program at its inception and throughout its production life, described that a provision of an incorporated document might not be considered a part of the Detail Specification if a "deviation" is listed in the appendix to the Detail Specification, or if the provision in question is rewritten such that a deviation is not required. Appendix II to the Detail Specification contains a host of deviations, including numerous deviations from specifications listed in incorporated documents. No deviation, however, is listed for the requirements of MIL–S–8698 ¶ 3.6.5.3, and this paragraph was not otherwise rewritten to eliminate the requirement that the main rotor blade not strike the tail boom.

Notably, deviations were sought and granted for less specific provisions of incorporated documents where it was apparent that the requirements of the provisions could not be met in all flight regimes. For example, the General Requirements for Helicopter Flying and Ground Handling Qualities (3 Apr. 1962) ("MIL–H–8501A") was incorporated into the Detail Specification. Paragraph 3.2.11 of MIL–H–8501A requires that the "helicopter shall exhibit satisfactory dynamic stability throughout the flight envelope." Deviation Number 5 of Appendix II allows that the "OH–6A will not meet this requirement at the critical corners of the flight envelope." Also of note is the fact that a deviation was granted for another paragraph of MIL–S–8698. Specifically, the requirement of MIL–S–8698 ¶ 3.6.3 that the "hub effective damping shall be at least 30 percent of critical damping" was eliminated. Paragraph 3.4.6 of the Detail Specification echoes this: "The

helicopter need not meet the requirements of paragraph 3.6.3 of MIL–S–8698 (see Appendix II, Deviations)."

Without considering anything else in the record, it seems clear that the Detail Specification for the helicopter in question contained a reasonably precise specification that the main rotor blade avoid striking the tail boom in all flight regimes. Since, as Judge Lively's opinion notes, "[i]t is undisputed that the fatal crash was caused by the [main rotor blade] striking and severing of a portion of the tail boom," the helicopter did not conform to this reasonably precise specification, and summary judgment was inappropriate on the basis of the government contractor defense. Admittedly, however, there is more to consider.

As described by Judge Lively, determining the "ultimate" reasonably precise specifications, *cf. Kleemann,* 890 F.2d at 700, may require exploring the government's involvement with the testing and development of the contract item, and the government's acquiescence in the finished product with knowledge of modifications of the original design. In *Kleemann,* for example, a Navy pilot was killed when the landing gear on his F/A–18 failed. The surviving spouse and children brought a diversity action against McDonnell Douglas, the contractor that had built the aircraft, alleging that the gear did not conform to the reasonably precise specifications contained in the Navy's original contract with McDonnell Douglas. Specifically, the plaintiffs indicated that a document incorporated into the detail specification for the F/A–18 contained a provision that the F/A–18 was to "withstand normal landing loads without bending, unlocking or causing uncontrolled motion of the aircraft." *Id.* Though the court admitted that "the documents referenced by plaintiffs embody part of the universe of specifications to which the landing gear must conform," *id.* at 702, it held that the provision in question merely presented "precatory goals developed for a product at the start of the procurement process," *id.* at 700, or "little more than the hopes of participants that the project on which they are about to embark will turn out well," *id.* at 703.

In determining the reasonably precise specifications to which the F/A–18 had to conform, the court looked to the entire procurement process which included not just initial contract specifications, but testing, refinements and specific acceptance of such refinements. For example, the initial contract required McDonnell Douglas

to submit detailed design drawings to the Navy for approval as the general specifications became embodied in the actual landing gear. The Navy reserved the right to reject drawings and to require revisions and modifications. These working drawings, and not simply the general qualitative specifications from the procurement stage, comprise "the reasonably precise specifications" contemplated by *Boyle.*

*Id.* at 702. In addition, "[b]etween 1979, when F/A–18 test flights began, and 1985, the Navy expressly approved or required a substantial number of landing gear design modifications and rejected others." *Id.* at 703. The plaintiffs claimed that the Navy itself found McDonnell Douglas to be not in conformance with the landing gear specifications for the F/A–18 when it issued a Notice of Defect in 1983. The court responded to this claim by noting that McDonnell Douglas. addressed the problem, and, in the end, the Navy specifically approved McDonnell Douglas' modification "and directed that it be incorporated into all new production models, including the aircraft that Kleemann was flying at the time of the accident. On May 24, 1985, the Navy advised [McDonnell Douglas] that the Notice of Defect was formally closed." *Id.* at 704. In summary, the court concluded that "[o]nly the detailed, quantitative specifications—and not those calling for such vagaries as a failsafe, simple or inexpensive product—are relevant to the government contractor defense. . . . [A] product conforms to reasonably precise specifications if it satisfies 'an intended configuration' even if it 'may produce unintended and unwanted results.' " *Id.* at 703 (citation omitted).

The reasoning of *Kleemann* is sound. If, after negotiation and modification of an original plan, the military and a contractor agree upon certain specifications for a particular piece of equipment like landing gear—or main rotor blade and tail boom apparati—

and the contractor builds the piece of equipment in conformance with these specifications, the government contractor defense properly bars state law from imposing liability upon the contractor. Such reasoning furthers the chief policy behind the government contractor defense that "the contractor should not be held liable at law for performing the government's bidding" (because, the military may, at times, choose to sacrifice a certain measure of safety for performance). *Id.*

That said, I return to the instant case to determine whether the record demonstrates that the reasonably precise specifications of MIL–S–8698 ¶ 3.6.5.3 were superseded by subsequent actions such that the "ultimate" reasonably precise specifications for the helicopter in question did not mandate that the main rotor blades never touch the tail boom. The first example of such a potential modification is that the Army, having directed that tests of the OH–6A's main rotor blade motion be conducted, seemed to accept the test results (prepared by Hughes Tool Company, Aircraft Division, on September 26, 1969) that the main rotor blades came to within *three* inches of the tail boom, whereas MIL–S–8698 ¶ 3.6.5.3 requires a greater clearance. Landgraf has apparently introduced no evidence to the effect that the Army, knowing this, required a design modification to increase the three-inch minimum clearance to the nine-inch clearance required by MIL–S–8698 ¶ 3.6.5.3. The government's acceptance of the helicopter with full knowledge of the three-inch minimum clearance might be taken as a modification of the initial reasonably precise specifications.

The problem remains, however, that MIL–S–8698 ¶ 3.6.5.3 also states: "The design of the rotors *shall* be such as to *preclude* the possibility of the blades striking each other or *any part of the helicopter.*" (Emphasis added.) Thus, even if the government acquiesced in a three-inch minimum clearance, more must be shown to demonstrate that it accepted the *possibility* that a main rotor blade would strike the tail boom.

While the OH–6A helicopter was still in the testing stage of development, it appears from the record that a main rotor blade

struck a tail boom at the termination of a power-off landing. As a consequence, the Army requested more testing "for the purpose of investigating tail boom strikes on OH–6A [aircraft].... The final result of this effort [was to be] the determination of possible changes to the OH–6A configuration leading to a reduction in the probability of tail boom strikes." While the majority takes the latter statement to mean that "[t]he Army apparently did not believe there could be a complete elimination of the probability of such strikes, only a reduction in that probability," it is conceivable and not unreasonable to infer that the Army wished to reduce that probability to zero, given the devastating nature of such an eventuality.

Hughes conducted the requested tests, which yielded the results referred to above, namely, that the main rotor blade on the OH–6A tested came to within three inches of the tail boom. The report on these tests concluded: "The abrupt full aft cyclic and full down collective motions used in this test were intended to simulate a severe autorotational landing condition. It is felt that these abrupt motions, to the critical control limits, exceed the normal pilot technique." The report did recommend further testing, however, to account better for variables which were not taken into account in the tests performed.

There is no evidence in the record that the Army responded to this report. Did the Army believe that the variables not taken into account during these tests would not diminish the clearance further? Was the Army convinced from this report that the prior tail boom strike incident was the result of a manufacturing, as opposed to a design, defect? If so, the military did not necessarily accept a modification of the no-strike requirement of MIL–S–8698 ¶ 3.6.5.3 or "treat[ ] MIL–S–8698 [¶ 3.6.5.3] as a precatory statement."

Other possible evidence of a modification of MIL–S–8698 ¶ 3.6.5.3 is the OH–6A's Operator's Manual (July 1969) which states, in pertinent part: *"WARNING*[:] When a pitch down condition exists, it is imperative that abrupt lowering of the collective and erratic movement of the cyclic control be avoided to prevent a rotor blade strike on the tail boom." From this, it might be argued that the government knew, accepted, and warned operators of the fact that, under certain conditions, a rotor blade might strike the tail boom. But even if the Operator's Manual evidences the "ultimate" reasonably precise specifications regarding whether the OH–6A was to be constructed so as to preclude the possibility of a main rotor blade-tail boom strike, it merely allows such a strike to occur upon an "abrupt lowering of the collective and erratic movement of the cyclic control" during a "pitch down condition." If such a condition did not exist during CWO Landgraf's test flight, the no-strike provision of MIL–S–8698 ¶ 3.6.5.3 would arguably control. Whether or not the condition existed is a question of fact for the factfinder. And there does not seem to be enough evidence in the record as it stands to say whether the condition did or did not exist so as to remove the question from the factfinder. Furthermore, while an Operator's Manual *may* constitute some evidence to support the argument that MIL–S–8698 ¶ 3.6.5.3 was modified, it does not, in my view, *conclusively* show that MIL–S–8698 ¶ 3.6.5.3 was superseded for purposes of the government contractor defense (as, for example, an amendment to the Detail Specification or active government involvement in further testing and development of the main rotor blade and tail boom apparati might).

The evidence in this case of a modification of MIL–S–8698 ¶ 3.6.5.3 is certainly less clear than the modifications held to constitute the "ultimate" reasonably precise specifications in *Kleemann*, for example. And MIL–S–8698 ¶ 3.6.5.3 is certainly less "precatory" and more "quantitative" than the specifications at issue in *Kleemann*. All told, the evidence that the government acquiesced in a modification of MIL–S–8698 ¶ 3.6.5.3 is, in my view, simply not sufficient to say that "there is no genuine issue as to any material fact and that [McDonnell Douglas] is entitled to a judgment as a matter of law." FED. R.CIV.P. 56(c). Did the helicopter design at issue in this case conform to the reasonably precise specifications approved by the United States? This is essentially a question of fact. The factfinder must determine what the "ul-

timate" reasonably precise specifications were and whether the helicopter conformed to them. *Boyle*, 487 U.S. at 514, 108 S.Ct. at 2519. What were the "ultimate" reasonably precise specifications as they relate to the main rotor blade-tail boom clearance in this case? Based on one's view of the record evidence, the answer to this question could lie anywhere between no clearance at all and nine inches, with three inches being a reasonable possibility. And one's answer essentially determines the availability of the government contractor defense. Since the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," FED.R.CIV.P. 56(c), viewed in a light most favorable to the nonmoving party, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986), show there to be a genuine issue of fact on an issue critical to whether McDonnell Douglas is entitled to the government contractor defense in this case, I would reverse the grant of summary judgment, and remand the case for further proceedings.