Donna Scott **OLIVER,** as Administratrix of the Estate of Arthur Dwayne Oliver, Plaintiff,

v.

**OSHKOSH TRUCK CORPORATION,** Defendant.

Erik B. **TATE** and Shirl D. O'Brien–Tate, Plaintiffs,

v.

**OSHKOSH TRUCK CORPORATION,** Defendant.

Nos. 93–C–206, 94–C–43.

United States District Court, E.D. Wisconsin.

Jan. 16, 1996.

1162

Edward E. Strain, III, David A. Sleppy, J. Edward Staples, Cathey & Strain, Cornelia, GA, Robert L. Herman, Atlanta Financial Center, Atlanta, GA, for Plaintiffs.

Thomas L. Smallwood, Michael D. Stotler, Borgelt, Powell, Peterson & Frauen, S.C., Milwaukee, WI, for Defendant.

STADTMUELLER, Chief Judge.

On March 1, 1993, Donna Scott Oliver (Oliver), as administratrix of the estate of Arthur Dwayne Oliver, brought a diversity

action against Oshkosh Truck Corporation (Oshkosh), based on an accident involving a truck manufactured by Oshkosh. On January 7, 1994, Erik B. Tate and Shirl D. O'Brien–Tate, husband and wife (collectively referred to as Tate), brought a similar diversity action based on the same accident. Currently before the court are Oshkosh's motions for summary judgment.[1] The two cases have been consolidated for purposes of this decision.

## I. BACKGROUND

On March 22, 1991, Tate, a corporal in the United States Marine Corps, participated in a convoy carrying supplies on the Khanjar Expressway near the Saudi Arabia–Kuwait border. Tate was a passenger in a MK–48 truck driven by Lance Corporal Oliver. Conditions on the Khanjar Expressway were dusty and visibility was poor, causing the convoy to slow from 20 miles per hour to 5–10 miles per hour. The lead vehicle and the four vehicles behind it stopped. Tate and Oliver were in the fifth vehicle and unfortunately, they were unable to stop before colliding with two other vehicles in the convoy. The fuel tank in Tate and Oliver's vehicle and the fuel tank in one of the other vehicles exploded. Oliver was killed, and Tate received third-degree burns over 60–70% of his body which required amputation of his left leg above the knee.

The crux of Oshkosh's motion for summary judgment does not involve the circumstances of the accident causing Tate's injuries and Oliver's death; rather, it involves the contract between Oshkosh and the Marine Corps for the production of the MK–48. The undisputed facts surrounding the design of the MK–48 are as follows.

The MK–48 is the front half of an articulated 8 × 8 transport truck known as the MK–48–14. The back half, the "14," is a flatbed detachable portion. Both halves of

the MK–48–14 are powered. The MK–48 has two exposed 75–gallon fuel tanks located on each side of the vehicle. A single exhaust pipe is located on the right side of the vehicle, and is positioned directly above and parallel to the right-side fuel tank. At its closest point, the exhaust pipe is 1.5 inches from the fuel tank.

In the late 1970s, the Marine Corps began development of a modern tactical vehicle fleet, or a "logistics vehicle system" (LVS). Initial efforts were unsuccessful. In 1978, the Marine Corps solicited responses from the heavy automotive and construction equipment industries for commercially available or modified vehicles that would meet the LVS specifications. Twenty-one companies, including Oshkosh, responded. Then, in 1980, the Marine Corps initiated a military procurement process known as a "request for proposal" to find a manufacturer to submit a prototype LVS vehicle meeting specific operational, performance, and container requirements. The Marine Corps accepted Oshkosh's proposal and they executed a contract for purchase.

The purchase contract provided that Oshkosh had "total design responsibility" and that "the submission and approval or disapproval by the government of any changes shall in no way relieve the contractor of this total design responsibility." The contract also set out the specifications for the vehicle, including:

> The vehicle shall have a fuel system conforming to Federal Motor Carrier Safety Regulations (393.65 and 393.76.
>
> . . . .
>
> The fuel tank(s) shall have adequate capacity for a supply of fuel to enable the vehicle, when towing two 22.5 ton (20.43 metric ton) trailers or one 65 ton (59.01 metric ton) trailer with rated loads, to travel not less than 300 miles (482.7 km) on hard

---

1. Also pending are Oliver's and Tate's motions for leave to file a supplemental brief in opposition to the motion for summary judgment and Oshkosh's motions to strike said supplemental briefs or file its own supplemental briefs. The court has considered all of the parties' filings and thus will grant Oliver and Tate leave to file their supplemental briefs and deny Oshkosh's motions

to strike. Additionally, as I find the parties' submissions sufficient basis on which to decide the motions for summary judgment, I will deny Oliver's and Tate's requests for oral argument.

Because the motions for summary judgment and the briefs in opposition filed in each case are identical, I will refer, hereinafter, to the motions and accompanying briefs in the singular.

surfaced or secondary roads over rolling terrain. When more than one fuel tank is furnished, means shall be provided to assure equalized fuel level in the tanks.

. . . .

The vehicle shall have an exhaust system conforming to Federal Motor Carrier Safety Regulation 393.83. The exhaust muffler shall be stacked, shall be equipped with a heat shield, and shall have a hinged rain cap. The exhaust system shall have a spark arrester, conforming to the material and performance requirements of MIL–A–27302, except when the vehicle is equipped with a turbocharged engine.

Federal Motor Carrier Safety Regulation 393.83 provides in part:

> Every motor vehicle having a device (other than as part of its cargo) capable of expelling harmful combustion fumes shall have a system to direct the discharge of such fumes. No part shall be located where its location would likely result in burning, charring, or damaging the electrical wiring, the fuel supply, or any combustible part of the motor vehicle.

49 C.F.R. § 393.83(a).

Oshkosh and the Marine Corps engaged in an ongoing dialogue regarding the design of the MK–48, based on tests performed by the Marine Corps on Oshkosh's prototype. Hundreds of changes were made to the prototype design during this time. Part of this dialogue concerned the configuration of the exhaust system and the fuel tanks. Oshkosh's placement of the fuel tanks and the exhaust system was to conform to the Marine Corps' width requirement for the MK–48. The Marine Corps did not request any changes in Oshkosh's proposed location of the fuel tanks and the exhaust system. Before final production, however, the Marine Corps asked Oshkosh to include "Explosafe" and, later, "Scott Foam," both explosion suppressants, in the fuel tanks to inhibit explosivity. Oshkosh included these materials in its design of the MK–48 and, on the Marine Corps' request, offered its opinion that an explosion suppressant would degrade the fuel supply and cause some damage to the engine. The Marine Corps then specified that an explosion suppressant not be used in the MK–48.

In 1983, after Oshkosh's design for the MK–48 had been modified enough to pass the Marine Corps' testing, the Marine Corps awarded Oshkosh the production contract. The final production contract included extensive specifications and dimension requirements for the MK–48, including specifications for the fuel tanks and the exhaust system. Oshkosh directs the court's attention to the following provisions in the production contract:

*1.3 Special Attention Items.* The following items as specified in detail in other sections of this contract are hereby highlighted. The vehicle systems listed herein *must* be capable of achieving the following:

1.3.1 The MK 48/16 must be capable of loading and towing a combat loaded M60A1 MB Tank (57 tons) on a M747 Semi–Trailer on improved and unimproved roads.

1.3.2 The MK 48/14 must be capable of transporting a 22.5 ton payload on improved roads and towing an additional 22.5 ton payload on an M871 semi-trailer with dolly convertor, and a 12.5 ton payload on a MK 14 with towing system kit.

1.3.3 All units (MK 48, MK 14, MK 15, MK 16, MK 17) must fit in an $8 \times 8 \times 20$ foot ANSI/ISO Flatrack Container.

1.3.4 All vehicles must be transportable by C130E, C130R, C141B and C5A aircraft.

1.3.5 All units must be capable of being externally transported by CH–53E Helicopter.

. . . .

*3.1 Basic Vehicle System and/or Components, Parts and Accessories.* The basic power/powered trucks or vehicle system of the type described in this specification, hereinafter referred to as "the vehicle", shall be comprised of components, parts and accessories which are standard commercial and which meet or exceed the requirements of this specification. The vehicle shall be complete in all respects, as would normally be delivered to the commercial heavy truck transport and construction equipment industry. The vehicle shall also be preserved, packaged and

packed in accordance with the best commercial practice acceptable to the Government and common carrier. The vehicle and all of its components shall have currently published rated capacities consistent with on/off road usage as indicated in para. 1.2 above. All power train components shall be certified by the contractor as being compatible with and properly matched with all related or affected components assembled to meet the specifications stated herein. Maximum commonality of components must be used throughout the vehicle, in addition to the requirement for commonality of components between vehicle, in addition to the requirement for commonality of components between vehicle models. All powered rear body units (MK 14, MK 15, MK 16 and MK 17) differences shall be limited to different length and strength of main frame structural members; addition or deletion of mounted body and equipment interface items; drive shaft lengths and components.

. . . .

3.1.2.10 Dimensions. Dimensions in the unloaded condition shall be as follows:

a. Overall operating height—shall not exceed 102 inches on all system types. The crane height shall not exceed 95 inches when in stowed position. . . .

b. All unit types (MK 48, 14, 15, 16, or 17) shall be capable of being loaded in a flatrack container on a commercial ship. The nominal dimensions of the flatrack is [sic] as listed:

(1) Length—20 feet

(2) Width—8 feet

(3) Height—8 feet

. . . .

d. Angle of approach and departure shall not be less than 45 degrees, loaded or unloaded, except than the angle of departure for MK 48/17 shall be not less than 40 degrees. The minimum ground clearance shall be not less than 13 inches.

. . . .

3.1.3 Performance. Requirements shall be met with vehicle systems loaded to specified GVW and GCW per para. 3.1.2.5.

Minimum gradeability and speed requirements are as follows:

3.1.3.1 Speed and Gradeability.

a. Vehicles MK 48/14, MK 48/17 with towed full trailer and MK 48/15 with semitrailer shall start on and climb a 10 percent grade and GCW (per 3.1.2.5) (adequate traction assumed). If a torque converter is provided, the system must start and after initial acceleration, climb the grades specified while maintaining the converter efficiency factor established by the manufacturer for continuous duty. System shall have gearing and torque capable of meeting the minimum gradeability requirements. . . .

b. Vehicles MK 48/14, MK 48/15 and MK 48/17 without towed load shall be further capable of starting on and climb (in forward direction) a 60 percent grade at a GVW of 64,000 lb, adequate traction assumed. This shall be a performance rather than a durability requirement. Vehicle shall have gearing and torque capable of meeting the minimum gradeability requirements. . . .

. . . .

3.1.3.3 Slope Operation. All vehicle types with off road GVW without towed load shall be capable of operation headed up and headed down slope on longitudinal grades as specified in para. 3.1.3.1 and side slopes up to 30 percent with each side of the vehicle up slope. As a result of the operation, no evidence of faulty lubrication, leakage or other malfunction shall be found.

. . . .

3.1.3.5 [sic] Fording. The vehicle, without prior preparation, (no kits) shall ford hard-bottom water crossings, fresh or salt water, to a depth of 60 inches for no less than 5 minutes duration without damage or additional maintenance prior to further operation, and less than one (1) percent contamination of lubricants in those enclosures which are designed to exclude contaminants. The engine must be capable of re-start during fording.

. . . .

3.1.3.9 *System Reliability.*

Each LVS type shall meet a system reliability requirement of no less than 600 Mean–Miles–Between–System–Failures (MMBSF), or 966 MKBSF. This includes primary major defects of any vehicle item which requires repair or replacement as a result of usage during the test period. In addition, crane assemblies shall meet a system reliability of 200 hours Mean–Time–Between–System–Failures (MTBSF) exclusive of vehicle requirements. This requirement is exclusive of the specified material handling equipment and winches.

. . . .

### 3.1.3.11 *Durability*

Each LVS type shall be capable of completing 20,000 continuous miles (32,186 km) of operation within or no greater than the severity of the specified mission profile, without degradation of the items listed in para. 3.1.3.11 requiring replacement regardless of maintenance level, or repair at a maintenance level greater than third echelon.

a. For the following major assemblies and systems:

 a. Engine

 b. Transmission

 c. Transfer Case

 d. Axle Assembly

 f. [sic] Articulation System

 g. [sic] Hydraulic System

At least four of the six test vehicles must each complete 20,000 continuous miles of test and not incur a single durability failure of any of the major assemblies/subsystems listed above.

b. All six test vehicles must each complete 20,000 continuous miles of test and not incur, in either vehicle module, a single durability failure of the frame. A frame/welded cross member interface separation, or a crack, or significant deformation of the frame or integral welded cross-member during test is considered a durability failure.

### 3.1.3.12 *Maintainability*

. . . . Each type LVS shall be designed so that each of the following can be removed from the vehicle and replaced in under four hours by a four-man team of trained mechanics:

a. Engine (only)

b. Transmission (only)

c. Engine–Transmission Assembly

d. Transfer Case

e. Axles

f. Suspension Spring Assembly

The four-hour criteria includes all preparation; i.e., hood removal, draining fluid, etc. Routine daily maintenance checks, i.e., engine oil, coolant level, lights and brakes, etc., must be readily accomplished without the use of tools. Pre-operation fluid level checks shall not take longer than five minutes. Components of the vehicle shall be readily accessible for servicing, repair, and replacement. Ease of maintenance provisions shall incorporate features insuring operating clearances, and facilitating maintenance and service operations.

. . . .

3.2.8 Fuel System. Fuel system shall conform to Federal Motor Carrier Safety Regulations 393.65 and 393.67.

3.2.8.1 Fuel Tanks. All Front Power Units shall be equipped with two 75 gallon corrosion resistant fuel tanks adequate to provide a minimum 300 mile operating range based on the max payload traveling over a mix of terrains as specified in Table II. A means shall be provided to assure equalized fuel level and draw in both tanks. A manual shut-off valve shall be furnished. Fuel tanks will be provided with minimum 3–inch diameter safety type tank filler cap or caps, which can be grasped and removed/installed with arctic mittens. Filler caps shall be located to preclude mud buildup and captive chained to filler neck. Removable strainers are required. A sealed filler cap and vent are required for fording requirements.

. . . .

3.2.9 Exhaust System. The exhaust system shall conform to Federal Motor Carrier Safety Regulations [sic] 393.83. The exhaust system as installed shall be gas tight and leak proof to prevent the accumulation of exhaust gas in the occupied areas in accordance with best commer[ci]al

practice. The tail pipe(s) shall be configured to prevent entry of rain water when vehicle is not operating. Exhaust mufflers and tail pipes shall be corrosion resistant and shall be furnished with adequate guards to prevent personnel contact while operating winches and other equipment mounted, or intended to be mounted, entering or exiting the cab, and normal entry and exit of rear deck. The exhaust system shall be positioned to allow fording of 60″ of water without kits.

Defendant's Brief in Support of Summary Judgment Motion, Ex. E–1.

The MK–48 fuel tanks were provided to Oshkosh by Cutler Metal Products Company (Cutler). On October 6, 1983, Cutler certified that the fuel tanks and liquid fuel system met Federal Motor Carrier Safety Regulations 393.67 and 393.65. Later, Oshkosh also certified that the fuel tanks and liquid fuel system conformed to the applicable Federal Motor Carrier Safety Regulations. The exhaust system was not similarly certified, and the parties dispute whether the exhaust system met the requirements of Federal Motor Carrier Safety Regulation 393.83.

Under the production contract, Oshkosh was required to obtain the consent of the Marine Corps before making any improvements to the MK–48. Oshkosh submitted a Safety Assessment Report, as required by the production contract, which stated in part, "Fuel is very flammable and can explode easily" and "Fuel can be ignited by a hot engine."

Finally, the production contract required a Marine Corps representative to inspect each completed vehicle. If the representative determined that a particular vehicle did not comply with the contract specifications, the vehicle would be returned to Oshkosh for corrections. The Marine Corps purchased about 1,600 vehicles in 1988.

In their complaints, Oliver and Tate set out the following bases for liability:

The MK48, as designed, manufactured and delivered by [Oshkosh], was defective and unreasonably dangerous in at least the following respects:

(a) The fuel tanks were located outside of the frame rails of the vehicle, making the tanks vulnerable to spillage and resulting fires in low-speed collisions;

(b) The materials used in manufacturing the fuel tanks were insufficiently strong to withstand foreseeable collisions;

(c) The fuel tanks failed to conform to specifications contained in the contract with the United States government;

(d) The MK48 was unreasonably dangerous to its users;

(e) The MK48 was not merchantable and not reasonably suited to the use intended;

(f) The MK48 was not accompanied by adequate warnings of the danger to users so as to permit those users to take precautions for their own safety.

[Oshkosh] knew or should have known of the danger presented by the fuel tanks of the MK48, yet failed to warn either the United States government or other prospective users of the dangers inherent in the vehicle. Because of its knowledge of the danger presented by the fuel tanks of the MK48, [Oshkosh]'s failure to remedy the dangerous condition or to warn users of the danger amounted to a willful and conscious disregard of the rights of others.

Complaint (Oliver) at ¶¶ 27–29; Complaint (Tate) at ¶¶ 26–28.

## II. DISCUSSION

■ Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In deciding a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party. *E.g., Fisher v. Transco Services–Milwaukee, Inc.,* 979 F.2d 1239, 1242 (7th Cir. 1992). With respect to the nonmoving party's burden, the Federal Rules of Civil Procedure provide that

[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon

the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e).

█ Oshkosh argues that it is entitled to summary judgment based on the government contractor defense established by *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). In *Boyle,* the Supreme Court set out a three-part test to determine if the government contractor defense applies:

> Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Boyle,* 487 U.S. at 512, 108 S.Ct. at 2518. The defendant bears the burden of proving each element of the defense. *Carley v. Wheeled Coach,* 991 F.2d 1117, 1125 (3d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 191, 126 L.Ed.2d 150 (1993). In the context of a motion for summary judgment, the defendant must show that there is no genuine issue of material fact as to each element of the defense. *Carley,* 991 F.2d at 1125. Oshkosh argues that these three factors are satisfied by the undisputed facts of this case; Oliver and Tate, predictably, argue that they are not.

### A. Approval of Reasonably Precise Specifications

The first prong of the *Boyle* test, whether the government approved reasonably precise specifications, actually involves three inquiries with regard to the facts presented here. First, I must determine whether the government has delegated, and to what extent, discretion over the product design to the contractor. Along that line, I also must ask whether the government's approval, if any, was meaningful or merely a formality. And thirdly, I must determine whether the specifications were reasonably precise.

█ The exercise of government discretion, relevant to the first two inquiries under the first element of the government contractor defense, is at the heart of the defense. The *Boyle* Court premised application of the government contractor defense on a "significant conflict" between state law and an area of uniquely federal concern, such as military procurement. *Boyle,* 487 U.S. at 507, 108 S.Ct. at 2515–16. To illustrate the parameters of such a conflict, the Court set out three scenarios. First, there is no significant conflict where the government merely orders a piece of equipment from a manufacturer's stock, because the government would not have a significant or unique interest in the design features of that piece of equipment.[2] *Boyle,* 487 U.S. at 509, 108 S.Ct. at 2517. On the other end, and as was the case in *Boyle,* if the duty imposed by the government contract is contrary to the duty imposed by state law, a significant conflict exists. Thus, where the government contract specifies a particular design feature that the plaintiff later argues violates the duty of care imposed by state law, the government contractor defense should apply to protect the uniquely federal interest. *Id.* Between these two scenarios is the situation where, for example, the United States contracts for the purchase and installation of an air-conditioning unit, specifying the cooling capacity but not the precise manner of construction, a state law imposing upon the

---

**2.** Apparently, Oliver and Tate are driving at this point by repeatedly suggesting that the MK–48 was a commercial vehicle. Although Oshkosh's proposal to the Marine Corps was based on what was referred to as a commercially available vehicle, it is abundantly clear from the record that the Marine Corps did not merely order a piece of equipment from Oshkosh's stock. Unlike the insulation in *In re Hawaii Fed. Asbestos Cases,* 960 F.2d 806 (9th Cir.1992), the only case cited by Oliver and Tate on this point, the MK–48 plainly was "developed on the basis of involved judgments made by the military [and not] in response to the broader needs and desires of end-users in the private sector." *Id.* at 811. Thus, this argument does not merit further analysis.

manufacturer of such units a duty of care to include a certain safety feature would not be a duty identical to anything promised the Government, but neither would it be contrary. The contractor could comply with both its contractual obligations and the state-prescribed duty of care. No one suggests that state law would generally be pre-empted in this context.

*Id.* Thus, where a government contract specifies a particular *operational* characteristic but does not mandate "the precise manner of *construction*," a significant conflict does not necessarily exist, because the government specifications may not preclude the inclusion of the safety feature.

The situation presented in this case falls into the middle ground identified by the *Boyle* court. The Marine Corps expressly delegated "total design responsibility" to Oshkosh, yet mandated several performance specifications. Presumably, then, the question is whether those performance specifications effectively mandated "the precise manner of construction" by limiting alternative designs. If the performance specifications were such that Oshkosh could *not* "comply with both its contractual obligations and the state-prescribed duty of care," then a significant conflict exists.[3]

With regard to the first inquiry, Oliver and Tate rely on *Trevino v. General Dynamics Corp.*, 865 F.2d 1474 (5th Cir.1989), in which the Fifth Circuit distinguished exercise and delegation of design responsibility:

> The government exercises its discretion over the design when it actually chooses a design feature. The government delegates the design discretion when it buys a product designed by a private manufacturer; when it contracts for the design of a product or a feature of a product, leaving the critical design decisions to the private contractor; or when it contracts out the design of a concept generated by the government, requiring only that the final design satisfy minimal or general standards established by the government.

*Trevino*, 865 F.2d at 1480. Thus, Oliver and Tate argue, because the purchase contract

provided that Oshkosh had "total design responsibility," the Marine Corps did not exercise any discretion with regard to the design of the MK–48. The undisputed facts and applicable case law undercut this argument. Although Oshkosh certainly had an active role in designing the MK–48, the Marine Corps' input, through contract specifications and testing, was extensive. Most importantly, the undisputed facts show that the Marine Corps approved Oshkosh's design. Government approval, rather than government design, is the key to the government contractor defense.

■ Despite *Trevino*'s broad language, the *Boyle* Court did not intend that active participation of the contractor in the design process would preclude application of the government contractor defense:

> The first two [elements of the government contractor defense] assure that the suit is within the area where the policy of the "discretionary function" would be frustrated—*i.e.,* they assure that *the design feature in question was considered by a Government officer, and not merely by the contractor itself.*

*Boyle*, 487 U.S. at 512, 108 S.Ct. at 2518 (emphasis added); *see also Carley*, 991 F.2d at 1125 ("[T]he government need not deprive the manufacturer of all discretion pertaining to a particular design feature in order for the government contractor defense to apply."). The Court's intent in this regard also is buttressed by its reliance on the "discretionary function" exception of the Federal Tort Claims Act, 28 U.S.C. § 2680(a), as a guideline for application of the government contractor defense. Section 2680(a) excepts from the Act's consent to suit "[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." The Court stated,

> We think that the selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function within the meaning

---

**3.** This essentially is Oshkosh's argument.

of this provision. It often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness. And we are further of the view that permitting "second-guessing" of these judgments through state tort suits against contractors would produce the same effect sought to be avoided by the FTCA exemption.

*Boyle,* 487 U.S. at 511, 108 S.Ct. at 2518 (citation omitted). "Thus, where the government exercises its discretion with regard to the design of a particular piece of equipment (instead of simply ordering it from stock), discretion expressed through 'engineering analysis' and the exercise of judgment regarding technical and military factors, and trade-offs between safety and mission effectiveness, and where the three *Boyle* elements are satisfied, a military contractor is entitled to immunity from suit under state tort law." *In re Aircraft Crash Litigation Frederick, Maryland,* 752 F.Supp. 1326 (S.D.Ohio 1990), *aff'd, Darling v. Boeing Co.,* 935 F.2d 269 (6th Cir.1991) (citation omitted).

Several lower court decisions emphasize the government's role in approving a contractor's design. In *Tillett v. J.I. Case Co.,* 756 F.2d 591 (7th Cir.1985), a soldier was killed when the front end loader he was operating overturned and crushed him. His widow sued the manufacturer, which raised the government contractor defense. In determining whether the government approved reasonably precise specifications, the court stated:

> In this case, the evidence submitted to the district court demonstrated that the Government provided defendant with specifications for various component parts of the front end loader. The Government's specifications did not include the presence of roll-over protection on the front end loader. The Government specified that defendant should produce the loader in conformance with defendant's own commercial

specifications in any areas in which the Government's specifications were silent. The Government further required defendant to produce a prototype of the front end loader, and to submit this prototype to Government inspection and approval before manufacture of the final product. The evidence indicated that defendant submitted to the Government for approval a prototype of the front end loader which did not include roll-over protection. The evidence also indicated that the Government approved defendant's prototype. Under these circumstances, this court finds that the Government established reasonably precise specifications for the front end loader and approved any supplementary specifications tendered by defendant in the form of a prototype loader.

*Tillett,* 756 F.2d at 599 (applying the government contractor defense standard endorsed by the *Boyle* court).

In *Harduvel v. General Dynamics Corp.,* 878 F.2d 1311 (11th Cir.1989), *cert. denied,* 494 U.S. 1030, 110 S.Ct. 1479, 108 L.Ed.2d 615 (1990), the widow of an Air Force pilot who died when his F–16 crashed sued the manufacturer of the plane.[4] In determining whether the first element of the government contractor defense was satisfied, the court considered the "continuous back and forth" between the government and the contractor in the design of the F–16:

> The Air Force initiated the F–16 project in the early 1970's by issuing a Request for Proposal seeking a contractor to develop the first "fly-by-wire" or all-electric fighter aircraft. General Dynamics responded with proposed Air Vehicle Specifications, that were evaluated by the Air Force Systems Program Office. The Office conducted an extensive review of the aircraft, including the electrical system, examining specifications, drawings, and blueprints. One group of Air Force engineers was specifically assigned to review of the electrical system. The Air Force conducted

---

4. The jury had returned a verdict in favor of the plaintiff, and the district court denied the defendant's motion for judgment notwithstanding the verdict. The defendant's motion was based on a version of the government contractor defense rejected in *Boyle.* The court of appeals reviewed the district court's decision in light of *Boyle,* which had been decided in the interim, and reversed. *Harduvel,* 878 F.2d at 1315.

independent review and analysis of the electrical system design and evaluated designs in a Preliminary Design Review, Critical Design Review, and later Physical Configuration Audit that took place between 1973 and 1975 prior to the start of production. Government review and approval of design and production methods continued after production began. Indeed, the Air Force requested an increase in wiring capacity on the particular block of F–16's from which Harduvel's came. The [government contractor] defense requires "only that the government approve reasonably precise specifications," and is met where, as here, the contractor incorporated government performance specifications into a design that the government subsequently reviewed and approved.

*Harduvel,* 878 F.2d at 1320. The *Harduvel* court specifically distinguished the procurement and design process in *Trevino. Id.* The *Trevino* court described the process in that case as follows:

In 1966 and 1967 the Navy contracted with General Dynamics Corporation Electric Boat Division to do the design work on the diving hangar. The contracts required General Dynamics to produce working drawings of the hangar and the lock-in/lock-out system and to assume full responsibility for all necessary technical research, to review its work product to assure compliance with the [Navy's circular of requirements describing the design of the diving hangar], and to conduct all quality assurance, including inspection of the end product, before issue to the Navy. General Dynamics supplied thirty-seven employees, who worked on-site at [the Mare Island Naval Shipyard] and produced 71 pages of detailed working drawings. Each of the drawings was signed by a government employee in a box marked "approved." After General Dynamics completed the drawings, their employees left [the shipyard], and the Navy performed all the manufacturing and conversion work on the [submarine].

... The Navy never performed nor required a formal design/safety review of the [submarine's] diving system prior to the accident.

*Trevino,* 865 F.2d at 1476–77. It was in reference to this process that the *Trevino* court addressed the meaning of government approval under *Boyle:* "When the government merely accepts, without any substantive review or evaluation, decisions made by a government contractor, then the contractor, not the government, is exercising discretion. A rubber stamp is not a discretionary function; therefore, a rubber stamp is not 'approval' under *Boyle." Trevino,* 865 F.2d at 1480.

In *Kleemann v. McDonnell Douglas Corp.,* 890 F.2d 698 (4th Cir.1989), *cert. denied,* 495 U.S. 953, 110 S.Ct. 2219, 109 L.Ed.2d 545 (1990), a Navy pilot was killed when his aircraft overturned during landing. His widow sued the manufacturer, alleging that the landing gear was negligently and defectively designed. The court held that the plaintiff's claim was precluded by the government contractor defense, finding the degree of the government's participation in the development of the aircraft pertinent:

Plaintiffs' claim is precisely the sort for which the [government contractor] defense was intended. This is true both because of the nature of defendant's product and the characteristics of the process by which it was designed. At issue here is a discretionary decision involving military hardware in which the government was a substantial participant.... It is hard to imagine a matter more uniquely in the province of the military—and one less appropriate to second-guessing by civilian courts—than the development of a high-technology, multi-mission aircraft.

Similarly, the design details of the F/A–18 illustrate the balancing of military and technological factors, including "the trade-off between greater safety and greater combat effectiveness." [*Boyle,* 487 U.S. at 511, 108 S.Ct. at 2518.] For example, the main landing gear at issue here had to absorb extremely high amounts of energy generated upon landing on a carrier. On the other hand, stowage of the gears could not interfere with external weapon storage....

The design and production of the F/A–18 also illustrate the exchange of views in the procurement process between military officials and the private contractor. *See Harduvel v. General Dynamics Corp.,* 878 F.2d 1311, 1320 (11th Cir.1989); *Tozer v. LTV Corp.,* 792 F.2d 403, 407 (4th Cir. 1986)[, *cert. denied,* 487 U.S. 1233, 108 S.Ct. 2897, 101 L.Ed.2d 931 (1988) ]. Beginning with bids for what would become the F/A–18, teams of Navy engineers met with each contractor for extended discussions of their submissions. When the Navy selected MDC to develop and build the F/A–18, the final design contracts for the aircraft incorporated MDC's original proposal as modified during extensive negotiations between the parties. During design development, MDC was required to submit detailed engineering drawings to the Navy for approval. All changes to the design or specifications of the aircraft required Navy approval, including proposals to address problems with the allegedly defective landing gear. The government also maintained an extensive staff of aircraft engineers on site at MDC's facilities in St. Louis.

It is this salient fact of governmental participation in the various stages of the aircraft's development that establishes the military contractor defense. Indeed, active governmental oversight is relevant to all three elements of defendant's burden. Where, as here, the Navy was intimately involved at the various stages of the design and development process, the required governmental approval of the alleged design defect is more likely to be made out.

*Kleemann,* 890 F.2d at 700–01.

*In re Aircraft Crash Litigation Frederick, Maryland* arose out of the crash of an Air Force EC–135N aircraft. The court, in determining whether the first factor of the government contractor defense was met, followed essentially the same analysis of the applicable cases as set out above and then stated:

Plaintiffs have repeatedly sought to structure the Court's inquiry under *Boyle* so as to require the Court simply to determine who, as between the Defendant contractors and the Air Force, "designed" the KC/C–135, its autopilot and the A/RIA modifications.... Plaintiffs assert, specifically, that Boeing (and not the Air Force) "prepared" the Detail Specification for the KC–135 series aircraft, and that Boeing "prepared" the specifications for the autopilot, which specifications were incorporated into the contract between Lear and the Air Force. Plaintiffs also quote the testimony of Mr. Wilson Hale that "Lear had to *design* the detailed components of the autopilot." Plaintiffs further assert that MDC (and not the Air Force) "designed" the A/RIA modifications, and "MDC's design concept" was incorporated into its contract with the Air Force.

Plaintiffs misconstrue the focus of this Court's inquiry under *Boyle.* The principal issue for this Court is not who "designed" the particular features of the EC–135N which Plaintiffs assert were defective, but whether the Air Force approved specifications for those features which were reasonably precise. Therefore, the argument that a Defendant's "design" or "design concept" became a part of its contract with the Air Force, supports, rather than vitiates, the *Boyle* defense. It is necessary under Boyle merely that a contractor incorporate the government's performance specifications into "a design that the government subsequently review[s] and approve[s]." *Harduvel,* 878 F.2d at 1320. If this occurs in the context of a design process marked by continuous interchange between the contractor and the government (and subject to government final approval of the design), the fact that the particular "design concept" at issue was the contractor's does not of itself defeat the defense.

*In re Aircraft Crash Litigation,* 752 F.Supp. at 1341–42 (footnote and citations to the record omitted).

■ Here, the purchase contract provided that Oshkosh had "total design responsibility," and that "the submission and approval or disapproval by the government of any changes shall in no way relieve the contractor of this total design responsibility." According to the officer responsible for admin-

istering the contract, the Marine Corps intended the "total design responsibility" provision to ensure that Oshkosh, rather than the government, would be responsible for the design of the MK–48. On the other hand, the Marine Corps evaluated Oshkosh's proposal before entering into the purchase contract, conducted tests on the prototype prepared by Oshkosh, and engaged in an ongoing dialogue with Oshkosh which resulted in hundreds of changes to the design of the prototype. Part of this dialogue concerned the exhaust system and the fuel tanks, although the Marine Corps did not request any changes in Oshkosh's proposed location of the fuel tanks and the exhaust system. It is undisputed that Oshkosh's placement of the exhaust system and the fuel tanks was designed to conform to the Marine Corps' width requirement for the MK–48. Before final production, the Marine Corps asked Oshkosh to include an explosion suppressant in the fuel tanks. Oshkosh included an explosion suppressant in its design of the MK–48 and, on the Marine Corps' request, offered its opinion that an explosion suppressant would degrade the fuel supply and cause some damage to the engine. The Marine Corps then specified that an explosion suppressant not be used in the MK–48. After two and a half years of extensive testing and hundreds of changes to Oshkosh's design, the prototype passed testing and the Marine Corps awarded Oshkosh the production contract. The final production contract contained extensive and exacting performance specifications and dimension requirements. The production contract also required Oshkosh to obtain the consent of the Marine Corps before making any improvements to the MK–48 and to submit a Safety Assessment Report. Finally, the Marine Corps inspected the final production of vehicles before accepting them for military use.

■ The design process here is, in all pertinent aspects, identical to the processes in *Tillett, Harduvel, Kleemann,* and *In re Aircrash Litigation.* As in *Tillett,* Oshkosh was required to submit a prototype for inspection, testing, and approval by the Marine Corps. After making hundreds of changes, the Marine Corps approved the prototype. The *Tillett* court determined that the con-

tractor's submission of the prototype and the government's subsequent inspection and approval was sufficient evidence to show that the government "established reasonably precise specifications for the front end loader and approved any supplementary specifications tendered by [the contractor] in the form of a prototype loader." *Tillett,* 756 F.2d at 599. As in *Harduvel, Kleemann,* and *In re Aircrash Litigation,* the Marine Corps engaged in a continuous exchange with Oshkosh regarding the design and performance specifications of the MK–48. The design of Oshkosh's prototype was determined by the precise performance specifications mandated by the Marine Corps. Based on the extensive testing conducted by the Marine Corps, the Marine Corps directed Oshkosh to make hundreds of changes until the prototype passed the Marine Corps' tests. The Marine Corps reviewed and approved each change to the design of the MK–48. As the *Harduvel* court held, "The [government contractor] defense requires 'only that the government approve reasonably precise specifications,' and is met where, as here, the contractor incorporated government performance specifications into a design that the government subsequently reviewed and approved." *Harduvel,* 878 F.2d at 1320.

Thus, the undisputed facts indicate that although the Marine Corps expressly delegated "total design responsibility" to Oshkosh, Oshkosh's design of the MK–48, including the placement of the fuel tanks and the exhaust system, incorporated the Marine Corps' performance specifications. The Marine Corps subsequently reviewed, tested, and approved Oshkosh's design. This approval was not merely a rubber stamp, as evidenced by the Marine Corps' extensive testing, ongoing dialogue with Oshkosh regarding the design of the MK–48, and veto of the inclusion of the explosion suppressant foam as a safety measure. The specifications, both the performance specifications mandated by the contract and the design specifications submitted by Oshkosh and approved by the Marine Corps, were undisputably reasonably precise. Most certainly, to paraphrase the *In re Aircraft Crash Litigation* court, the undisputed facts establish that

Oshkosh incorporated the Marine Corps' performance specifications into a design that the Marine Corps subsequently reviewed and approved. This occurred in the context of a design process marked by continuous interchange between Oshkosh and the Marine Corps (and which was subject to Marine Corps' final approval of the design). Thus, the fact that the particular "design concept" at issue was Oshkosh's does not of itself defeat the defense. I conclude, therefore, that although the Marine Corps expressly delegated "total design responsibility" to Oshkosh, the Marine Corps' participation in the design process and approval of the final design were both extensive and authoritative, and not merely rubber stamps. Further, the specifications approved by the Marine Corps were reasonably precise. Thus, Oshkosh has established the first element of the government contractor defense.

### B. Equipment Conformity

To establish the second element of the government contractor defense, Oshkosh must show that the MK–48 conformed to the specifications approved by the Marine Corps. Oliver and Tate argue that the MK–48 failed to conform to two of the contractual specifications: that the vehicles comply with Federal Motor Carrier Safety Regulation 393.83 and that the vehicles be "complete in all respects." Specifically, Oliver and Tate argue that the placement of the exhaust pipe on top of the right fuel tank likely will result in burning the fuel supply or fuel vapors, in violation of Federal Motor Carrier Safety Regulation 393.83, and that the MK–48 was not "complete in all respects" because it was not crash worthy. Oshkosh contends that the Marine Corps approved the configuration of the fuel tanks and the exhaust system, and that it did not deviate from the Marine Corps' specifications because the location of the fuel tanks and the exhaust system was dictated by the width requirement for the MK–48. Two considerations are important here: whether the alleged defect is one of design or manufacture, and whether the relevant specifications are reasonably precise.

Although Oliver and Tate use the term "manufacture" in their briefs, they do not contend that the alleged defect in the MK–48 was one of manufacture. Rather, it is clear that the basis for Oliver's and Tate's actions is an alleged defect in the design of the exhaust system. In *Harduvel*, the court distinguished between design and manufacturing defects:

In determining whether a claimed defect is one of "design" for purposes of the government contractor defense, the proper focus is the protection of discretionary governmental functions for which the defense is intended. If a defect is one inherent in the product or system that the government has approved, it will be covered by the defense. Where a defect is merely an instance of shoddy workmanship, it implicates no federal interest. This distinction between "aberrational" defects and defects occurring throughout an entire line of products is frequently used in tort law to separate defects of manufacture from those of design. Stated another way, the distinction is between an unintended configuration, and an intended configuration that may produce unintended and unwanted results.

*Harduvel*, 878 F.2d at 1317 (citation omitted). The court went on to hold that the second prong of the government contractor defense was satisfied based on this analysis:

To say that a product failed to conform to specifications is just another way of saying that it was defectively manufactured.... Plaintiff did present substantial evidence that the design—not the manufacture—of the F–16 wiring system was susceptible to dangerous wire chafing, but that claim is subject to the *Boyle* defense. The second condition for application of the defense is present here as a matter of law.

*Harduvel*, 878 F.2d at 1321. Thus, because Oliver and Tate argue that the *design* of the MK–48 did not comply with Federal Motor Carrier Safety Regulation 393.83 and the contract provision that the vehicles be "complete in all respects," their footing is more tenuous than if they had alleged a manufacturing defect. I already have determined that the Marine Corps approved reasonably precise specifications for the design of the MK–48, including the design of the exhaust system. As a matter of logic, then, it be-

comes difficult to argue that the design did not conform to the specifications by which the design was developed. As the *Kleemann* court stated,

> It is this salient fact of governmental participation in the various stages of the aircraft's development that establishes the military contractor defense. Indeed, active governmental oversight is relevant to all three elements of defendant's burden. Where, as here, the Navy was intimately involved at the various stages of the design and development process, the required governmental approval of the alleged design defect is more likely to be made out. *See Ramey v. Martin–Baker Aircraft Co.,* 874 F.2d 946, 950–51 (4th Cir.1989); *Dowd v. Textron, Inc.,* 792 F.2d 409, 412 (4th Cir.1986)[, *cert. denied,* 487 U.S. 1233, 108 S.Ct. 2897, 101 L.Ed.2d 930 (1988) ]. Similarly, the Navy's extensive participation, including reservation of the power to approve or disapprove design modifications, enhances the likelihood of final product conformity.

*Kleemann,* 890 F.2d at 701.

Further, the specifications on which Oliver and Tate rely are not reasonably precise. In *Kleemann,* the plaintiffs argued that the F/A–18's landing gear failed to conform to the Navy's specifications that the landing gear be strong enough to withstand normal landing loads without bending. The court first recounted the Navy's extensive role in the development of the F/A–18's design, including the design of the landing gear and then concluded,

> Plaintiffs' reference to the general failure of F/A–18 landing gear to withstand normal landing loads without bending or unlocking fails to take into account this significant history. Requirements such as an ability to withstand normal loads and prohibitions against operational failures represent little more than the hopes of participants that the project on which they are about to embark will turn out well. General qualitative specifications must be distinguished from the "detailed, precise and typically quantitative specifications for manufacture of a particular military product." *Shaw v. Grumman Aerospace Corp.,*

778 F.2d 736, 745 (11th Cir.1985)[, *cert. denied,* 487 U.S. 1233, 108 S.Ct. 2896, 101 L.Ed.2d 930 (1988) ]. These two broad types of specifications often overlap and may even be at cross purposes—for example, design specifications for a complex back-up system may conflict with the qualitative requirements of ease of maintenance, combat effectiveness or cost containment. Only the detailed, quantitative specifications—and not those calling for such vagaries as a failsafe, simple or inexpensive product—are relevant to the government contractor defense.

> In essence, plaintiffs' argument is that the ultimate design of the landing gear failed to produce an aircraft that performed perfectly. Plaintiffs' view would render the government contractor defense illusory. Nonconformance to precise specifications must mean more that the design does not work in compliance with some "general admonition against an unwanted condition." *Harduvel,* 878 F.2d at 1319 n. 3. A product involved in a design-induced accident would, as a definitional matter, always would be deemed not to comply with such generalities since no performance specifications approved by the government would purposely allow a design that would result in an accident. In fact, plaintiffs describe exactly the situation in which the government contractor defense *does* apply: when the required ultimate military design fails to produce a "reasonably safe" product under state law. Contrary to plaintiffs' assertions, a product conforms to reasonably precise specifications if it satisfies "an intended configuration" even if it "may produce unintended and unwanted results." *Id.* at 1317. The evidence demonstrates that the alleged defect inhered in the unique design of the landing gear itself—as required by the Navy—and did not result from any deviation from the required military specifications.

*Kleemann,* 890 F.2d at 703 (some citations omitted).

The only case on which Oliver and Tate rely with regard to this issue is easily distinguishable from the facts at hand. In *Gray v.*

*Lockheed Aeronautical Sys. Co.*, 880 F.Supp. 1559 (N.D.Ga.1995), a Navy S–3 aircraft crashed after the pilot was unable to correct a slow right roll. The crash was caused by the malfunction of the servo, the portion of the aircraft which provides lateral control. The court found, essentially, that the servo did not switch to manual mode when it should have and that this failure was caused in part by mis-sized pins and latches in the servo. The court accordingly determined that the servo did not conform to the Navy's specification requiring "an automatic manual reversion system that operated without a hazardous lag" because the servo did not engage automatically and suffered a lag of four to five times that intended by the defendant's design. 880 F.Supp. at 1567. The facts of *Gray* are plainly different from those presented here. Oliver and Tate point only to contract provisions requiring that no part of the exhaust system be located where it is likely to ignite the fuel and that the vehicles be "complete in all respects." These, unlike the specification in *Gray* that the servo have an automatic manual reversion system that operates without a hazardous lag, are not reasonably precise specifications. Instead, they simply are "general admonitions" that the MK–48 be crash worthy.

Oliver and Tate also cite *Landgraf v. McDonnell Douglas Helicopter Co.*, 993 F.2d 558 (6th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 553, 126 L.Ed.2d 454 (1993). In that case, the plaintiff argued that the helicopter manufactured by the defendant for the Army did not meet the Army's specification that the rotor-tail boom clearance be nine to twelve inches because the clearance was in fact only three inches. The court determined that the specification in question was "a desirable goal and a recommended way of achieving it, but not precise specifications." *Id.* at 564. Importantly, the court noted that the Army was aware of the three-inch clearance, yet did not order additional testing or design changes: "We do not believe the Army treated the [specification] as formulating mandatory requirements. By permitting production to continue without any change in design following the 1969 tests, the Army made a discretionary decision to not insist on the clearance recommended in [the specification]." *Id.* The *Landgraf* court also expressly approved the *Kleemann* and *Harduvel* courts' application of the government contractor defense. *Id.*

I conclude that the situation presented in this case more closely resembles those addressed by the courts in *Harduvel, Kleemann,* and *Landgraf.* The provisions on which Oliver and Tate rely are not reasonably precise. They are general qualitative specifications, rather than " 'detailed, precise and typically quantitative specifications for manufacture of a particular military product.' " *Kleemann,* 890 F.2d at 703 (quoting *Shaw v. Grumman Aerospace Corp.,* 778 F.2d 736, 745 (11th Cir.1985), *cert. denied,* 487 U.S. 1233, 108 S.Ct. 2896, 101 L.Ed.2d 930 (1988)). I am further convinced by the undisputed facts that the Marine Corps was presented with a prototype of the MK–48 with the same exhaust system, that the Marine Corps tested the prototype and discussed the exhaust system with Oshkosh, yet ordered no changes to the design or location of the exhaust system or the fuel tanks, and that the Marine Corps specifically considered and rejected including an explosion suppressant. Because I find that the provisions on which Oliver and Tate rely are not reasonably precise, but precatory at best, I must conclude, based on the undisputed facts, that the MK–48 conformed to the specifications approved by the Marine Corps.

**C. Dangers Known to the Supplier**

The third and final element of the government contractor defense is that the supplier warned the government about dangers in the use of the equipment which were known only to the supplier. Oliver and Tate argue that Oshkosh did not inform the Marine Corps that only Diesel Number 2 fuel should be used in the MK–48. The Marine Corps used Jet A–1 fuel, which is more volatile. Oshkosh, according to Oliver and Tate, should have warned the Marine Corps that the Jet A–1 fuel would be more likely to burn in a crash. Specifically, Oliver and Tate state:

In this case, Oshkosh has taken the position from the beginning that one of the main contributing causes of the explosions was the use by the military of Jet A–1 fuel

because Jet A–1 fuel is much more volatile than the specified fuel, Diesel Number 2 (Exhibit "29", ¶ 5; Exhibit "30", ¶ 1). It is clear from the evidence that [Oshkosh] did know that the military was planning to use Jet A–1 fuel in the MK–48; however, it never warned the government that it should use only Diesel Number 2 fuel (Depo. of Lloyd Rank, p. 73–74, Tab 7; Depo. of Maj. John Wozniak, p. 115, Tab 8; Depo. of Martin W. Dankanich, p. 15, Tab 1). In other words, in direct response to the military's inquiries about whether or not it could use Jet A–1 fuel, [Oshkosh] indicated that the use of that alternative fuel would be acceptable. (Exhibit 31, pp. 1, 6, 9, 11–12). [Oshkosh], however, never informed the Government of the knowledge it had that the vehicle was more likely to burn in a crash because Jet A–1 fuel is more volatile than Diesel Number 2 fuel. (Depo. of Danny Lanzdorf, p. 35–36, Tab 5; Depo. of Lloyd Rank, p. 73–74, Tab 7; Depo. of Martin W. Dankanich, p. 15, Tab 1; Depo. of Major John Wozniak, p. 115, Tab [8]).

Plaintiffs' Brief in Opposition to Summary Judgment, at 18–19. Oliver and Tate also point to the fact that Oshkosh currently uses a warning label on the MK–48 specifying "Diesel Fuel Only." On its part, Oshkosh argues that it outlined all known risks involving the MK–48 in its safety assessment report, which Oshkosh was required to prepare under the contract. Further, Oshkosh argues that it did not know that the Marine Corps was planning to use Jet A–1 fuel in the MK–48. Instead, Oshkosh notes that it approved temporary use of JP–5 fuel in MK–48s that were used on board ships.

It is necessary, at this juncture, to examine the factual allegations of the parties on this issue, as Oliver and Tate's characterization of the evidence is questionable. Oliver and Tate cite several portions of their Exhibit 31 which mention Jet A–1 (which is similar to the military fuel JP–8). On page 1, which appears to be a telex to Oshkosh, it states, "JP–4, JP–5, and JP–8 can be used in our fuel system on the DA/LVS engine. These fuels can be used for emergency or for intermittent use. If used for continuous use exceeding 600 hours it is recommended to add 5% by volume of lube oil." Page 6, which appears to be part of a report issued by the Army Fuels and Lubricants Research Laboratory, states that the Army approved JP–5 as an alternate fuel to diesel fuel, and that "[b]oth JP–5 and JP–8 are aviation kerosene turbine engine fuels which essentially differ only in their flash and freezing point requirements." Page 9 of the same report states in part, "Non-winterized diesel fuels ... generally have relatively high pour and cloud points; therefore, it has been the practice in Alaska to use DF–A or Jet A–1 (JF–8) year-round in all diesel-powered equipment, especially in Fairbanks and Northern regions. For example, all equipment operating on the Alaskan Pipeline during its construction used Jet A–1 with no problems being reported." On page 10, in the conclusion of the report, it states that "JP–5 and JP–8 are acceptable alternatives for DF–2 as fuels in all vehicles and stationary equipment powered by compression-ignition engines" and that "JP–5 or JP–8 should be adequate fuels for the 6.2L diesel-powered high mobility multipurpose wheeled vehicles (HMMWV) and commercial utility and cargo vehicles (CUCV)." The recommendation section of the report, on page 12 of Oliver and Tate's Exhibit 31, states, "Based on the documents reviewed in this report and the extensive experience with the problem-free use of JP–5 and JP–8 in diesel engines within the Army and Navy, it is recommended that JP–8 be considered an alternate to diesel fuel DF–2, in the same manner that JP–5 is now approved as an alternate fuel...."

Oliver and Tate also cite several pages of deposition testimony. Lloyd Rank, Oshkosh's program manager, was asked, "Did Oshkosh ever tell the government that they should not use JP–8 or JA–1 fuels?" He answered,

Well, my recollection of this and from the review of the documents here is that we were asked specifically whether we would object to using JP–5 fuel during storage and operating conditions during an exercise which involved pre-positioning while the vehicles were aboard ships. Okay? And while there's references to JP–8 and DF–2 and all—there's all kinds

of references to various fuels in here, the question was—to us was very narrow. It said will we—if we use JP–5 in these conditions, will Oshkosh have—well, it says, "Please indicate whether the JP–5 fuel for general operations use will have any impact on the LVS engine warranty", so he asked a very specific question. In fact, that is the—that's the—that is the question that I picked up and was attempting to respond to. We never did discuss JP–8. I never—I don't think we even discussed that with—even with Captain Wozniak. What he wanted to do was know if Detroit Diesel would void the warranty if we used JP–5 in the LVS engine.

Deposition of Lloyd Rank, at 74. When asked "[D]id you or anyone else at Oshkosh ever tell the government not to use JP–8 fuel in the LVS vehicle?" Rank answered, "I don't think we ever discussed it. Correct. No, no, we did not tell them they couldn't." *Id.* Major John Wozniak, the project officer, testified to the following:

Q. Do you know anything about any request by the military to use JP–5 and JP–8 fuel in the vehicle?

A. Yes, sir. At some point we had asked Oshkosh Truck Company whether or not we could use the JP fuels and have an effect on the vehicle warranty. We were concerned that the vehicle warranty as it stood may have been voided if we had used any fuel other than the diesel. And the main reason was is on MPS, maritime prepositioned shipping, they don't have diesel fuel. They have jet propellant five, and we also run into jet propellant eight. So our concern was it be able to use the same fuel that we have prepositioned aboard the ships. So a request was made of Oshkosh about the suitability and the applicability of using this vehicle without voiding the warranty.

Q. What was the response to that?

A. The answer we got back is yes, that it could be used.

Q. And did that include JA–1 fuel?

A. Not specifically. That was never brought up in the discussion. The JA–1 fuel discussion was never brought up until Saudi Arabia when in fact we wanted to use military fuels. JA–1 is a commercial fuel. Now, there is not much of a difference between JA–1 and jet propellant eight. There is [sic] three additives. And this is from talking with the fuel experts at Fort Belvoir. Essentially they are the same except for these additives which are literally in trace amounts in the fuel. They do not substantially make up any large amount of the fuel. So Jet A is substantially the same as jet propellant eight.

Q. Let me ask the same question in regard to JP–8. Did Oshkosh approve that fuel?

A. I'm not sure if they had or hadn't on that one, sir. Jet propellant five I know we had. I don't recollect whether or not we had done jet propellant eight. I'd have to take a look at the documents.

Q. Do you know—Did Oshkosh know that that fuel was going to be used, jet propellant eight?

A. Could you rephrase that question, please?

Q. Did Oshkosh know that the military was going to use jet propellant eight?

A. Only if we had asked them. And I'd have to take a look at the letter that we went [sic] to them with asking them about the fuels. . . . Otherwise, we would have to infer that they had read into it and looked at all the types of fuels. And that would have been a supposition.

Q. Did they definitely know that fuels other than diesel would be used in the vehicle, diesel number two?

A. Yes, sir.

. . . .

Q. Did anyone from Oshkosh ever warn the military that there was some danger in using fuels other than diesel number two?

A. No, sir. The only concern that had come through is on JP–4. And I think JP–4 was determined not to be an appropriate fuel in the system. JP–4 is much different than JP–5 and JP–8.

Deposition of Major John Wozniak, at 112–115. Corporal Martin Dankanich, one of the convoy drivers, testified that he had never

been told not to use Jet A–1 fuel in the MK–48. Deposition of Martin W. Dankanich, at 15. Danny Lanzdorf, Oshkosh's Chief Engineer on the LVS project, testified to the following:

Q. Do you have any opinion one way or the other as to whether JA–1 fuel would make the LVS vehicle more likely to burn in a crash?

A. The only thing that I can tell you is that the flash point of Jet A fuel is higher than DF–2, and certainly that makes the fuel more volatile.

Q. Would that make the vehicle more likely to burn in a crash or do you know?

A. If the fuel is more volatile and has a lower flash point, then yes, it would be more likely to—more likely to burn. That would make the JP—or the Jet A fuel more hazardous. I'm not offering an opinion on the degree at this point, but that is a fact, that the volatility and flash point of the two fuels are different, and directionally it makes the Jet A fuel and JP–8 more hazardous.

Deposition of Danny Lanzdorf, at 35–36.

Oshkosh, on the other hand, lists several undisputed facts to the contrary. First, and perhaps most importantly, it is undisputed that the Marine Corps did not inform Oshkosh of its intention to use Jet A–1 fuel in the MK–48. In fact, it did not inform Oshkosh that it intended to use JP–8 fuel. The Marine Corps asked Oshkosh to approve the limited use of JP–5 fuel for prepositioning, which it did. Second, the evidence indicates that the Marine Corps had as much, if not more, knowledge as Oshkosh regarding the relative volatility of the various fuels. Third, the Marine Corps was aware of the danger of explosion because it specifically considered (and, notably, rejected) the inclusion of an explosion suppressant. Additionally, the continuous back and forth between Oshkosh and the Marine Corps in developing the design of the MK–48, including the fuel tanks and exhaust system, makes it more likely that Oshkosh imparted any information it possessed regarding any dangers. And fourth, Oshkosh prepared a safety assessment report which stated, in its General Recommendations on Safety:

21. Fuel is very flammable and can explode easily. To avoid serious injury or death, keep fuel away from open fire and keep fire extinguisher within easy reach when working with fuel. Do not work on fuel system when engine is hot. Fuel can be ignited by hot engine. Smoking is prohibited while working with fuel.

Defendant's Exhibit G–1, at 22. Additionally, the report identified "fire from vehicle fuel" as a "significant hazard," and diesel fuel as a "hazardous material." *Id.* at 28.

In *Harduvel*, the defendant produced evidence that the Air Force knew of the wire-chafing problem in the F–16 before Captain Harduvel's fatal crash. Further, the defendant presented uncontested evidence that it had not withheld any information regarding the chafing or any other problem from the Air Force. The plaintiff argued that despite that evidence, the defendant "failed to inform the Air Force of the 'seriousness' of the chafing problem, causing the Air Force to take insufficient preventative measures." *Harduvel*, 878 F.2d at 1321. The court disagreed, noting that the record contained no indication that the defendant "possessed knowledge that chafing was a graver danger than was known by the Air Force." *Id.* The court concluded,

The Air Force was plainly aware of the chafing problem in the F–16 generally, and of the possible serious consequences of chafing. There is no evidence that General Dynamics had knowledge it withheld. Despite its knowledge, the Air Force continued to fly the hundreds of F–16's in operation, and to purchase additional ones. Its decision was simply to address the chafing problem though the regular 100-hour inspections and technical orders. We think the third *Boyle* condition is satisfied here as a matter of law.

*Harduvel*, 878 F.2d at 1322 (citation omitted).

Here, the undisputed evidence shows that Oshkosh did not warn the Marine Corps that Jet A–1 fuel would be more likely to burn in the event of a crash. However, the third prong of *Boyle* is not that the supplier must warn the government of every

possible danger; it's that the supplier must warn the government of the dangers in the use of the equipment that were *known* to the supplier but *not known* to the government. Essentially, Oliver and Tate argue that Oshkosh was aware of two factors: that Jet A–1 fuel was more volatile than diesel fuel, and that the configuration of the exhaust system and the fuel tanks in the MK–48 was such that the fuel could ignite in a crash. And, indeed, the evidence does show that Oshkosh had knowledge of both of these facts. As in *Harduvel,* however, the evidence also shows that the Marine Corps shared that same knowledge. The report contained in Oliver and Tate's Exhibit 31, which discusses the use of JP–5 and JP–8 as alternative fuels to diesel, was prepared by the "fuel experts at Fort Belvoir," the Army's Fuels and Lubricants Research Laboratory. Major Wozniak's deposition testimony indicates that he is familiar with the differences between diesel and jet propellant fuels. And Danny Lanzdorf, Oshkosh's Chief Engineer for the MK–48, based his opinion that Jet A–1 fuel is more volatile than diesel fuel on the higher flash point of Jet A–1, a fact which is contained in the Army's report.

Further, the Marine Corps had the same knowledge as Oshkosh regarding the configuration of the exhaust system and the fuel tanks on the MK–48. The Marine Corps certainly was aware that the fuel could ignite in the event of a crash, because it specifically considered including an explosion suppressant. The Marine Corps was involved extensively in the development and design of the MK–48. There is nothing to indicate that Oshkosh withheld information concerning the exhaust system or the likelihood that the fuel would ignite in a crash. To quote the *Kleemann* court one last time,

It is this salient fact of governmental participation in the various stages of the aircraft's development that establishes the military contractor defense. Indeed, active governmental oversight is relevant to all three elements of defendant's burden. Where, as here, the Navy was intimately involved at the various stages of the design and development process, the required governmental approval of the alleged design defect is more likely to be made out.

See *Ramey v. Martin–Baker Aircraft Co.,* 874 F.2d 946, 950–51 (4th Cir.1989); *Dowd v. Textron Inc.,* 792 F.2d 409, 412 (4th Cir.1986)[, *cert. denied,* 487 U.S. 1233, 108 S.Ct. 2897, 101 L.Ed.2d 930 (1988) ]. Similarly, the Navy's extensive participation, including reservation of the power to approve or disapprove design modifications, enhances the likelihood of final product conformity. Government involvement in the process also makes it more likely, though not certain, that a sharing of information will occur with respect to potential dangers in the use of the equipment. As a final matter, extensive governmental participation provides tangible evidence of the strong federal interest which justifies the creation of a federal common law defense for government contractors in the first place.

*Kleemann,* 890 F.2d at 701.

Finally, to clinch this last element of the government contractor defense, there is absolutely no evidence to indicate that Oshkosh even considered the possibility of using Jet A–1 fuel in the MK–48. Without knowledge that the Marine Corps planned to use Jet A–1 fuel in the MK–48, it is difficult to see how Oshkosh withheld information regarding the volatility of the Jet A–1 fuel. Indeed, the evidence shows that the Marine Corps possessed the same knowledge as Oshkosh concerning the separate facts of the volatility of Jet A–1 fuel and the configuration of the MK–48's exhaust system and fuel tanks. I see no reason why Oshkosh should have made, or evidence that it did make, some inference or discovery about the particular volatility of Jet A–1 fuel in the MK–48 that the Marine Corps did not or could not make itself. I conclude, based on the undisputed evidence, that Oshkosh did not fail to warn the Marine Corps of any dangers in the use of the MK–48 that were known to Oshkosh but not to the Marine Corps.

### D. Failure to Warn

Oliver and Tate contend that even if I find that Oshkosh has satisfied each of the *Boyle* elements with regard to the design of the MK–48, their failure-to-warn claims under Wisconsin law should survive summary judg-

ment. Oliver and Tate argue that in order for the government contractor defense to apply to a failure-to-warn claim, the defendant must show that the government either prohibited warnings altogether or dictated the content of the warnings.

 I disagree with Oliver and Tate's assessment of the law applicable to failure-to-warn claims. None of the parties cites, nor has my own research disclosed, any Seventh Circuit case on point. In keeping with the federal interests identified by the Supreme Court with regard to design liability, however, it appears prudent to impose a burden on the defendant similar to that announced in *Boyle*. The Sixth Circuit recently addressed the issue in *Tate v. Boeing Helicopters*, 55 F.3d 1150 (6th Cir.1995). Because I am persuaded by the logic of its analysis, I will quote the court's opinion at length:

> We agree that the defendants' success in establishing the government contractor defense against the design defect claim does not by itself establish a defense to the plaintiffs' failure to warn claim. Several of our sister circuits have applied the government contractor defense against failure to warn claims; those cases do not focus on the underlying design defects, but instead focus on the *warnings*. *In re Hawaii Fed. Asbestos Cases*, 960 F.2d 806, 812–13 (9th Cir.1992) (dictum); *Dorse v. Eagle–Picher Indus., Inc.*, 898 F.2d 1487, 1489 (11th Cir.1990); *In re Joint E. & S. Dist. N.Y. Asbestos Litig.*, 897 F.2d 626, 632–33 (2d Cir.1990). Warning the government of dangers arising from a specific design— the third condition of *Boyle*—does not encompass or state a failure to warn claim; it simply encourages contractors to provide the government with all the information required to soundly exercise its discretion. "By contrast, tort law duties to warn accomplish an entirely different objective of helping those who use or otherwise come into contact with a product to protect their own safety." *In re N.Y. Asbestos*, 897 F.2d at 632. In the government contractor defense context, design defect and failure to warn claims differ practically as well as theoretically. Simply because the government exercises discretion in approving a design does not mean that the government considered the appropriate warnings, if any, that should accompany the product. This is especially true with regard to military equipment procurement where complex judgments by representatives of the Armed Forces often involve "balancing of many technical, military, and even social considerations." *Boyle*, 487 U.S. at 511, 108 S.Ct. at 2518. We hold that the government contractor defense [against failure-to-warn claims] is not necessarily established merely by satisfying the government contractor defense conditions as to design defect claims.

> Although the rule announced in *Boyle* applies only to design claims, and the government contractor defense as applied against failure to warn claims is independent of design defect claims, *Boyle* provides guidance in determining when state law governing a failure to warn claim can be displaced. The *Boyle* Court explained that the government contractor defense displaces state law when imposing state tort liability "significant[ly] conflict[s]" with a federal interest. *Id.* at 507, 108 S.Ct. at 2516. As we have seen, there is a federal interest in protecting the government's FTCA exemption for discretionary functions. When the government exercises its discretion and approves designs prepared by private contractors, it has an interest in insulating its contractors from liability for such design defects. *Id.* at 511–12, 108 S.Ct. at 2518–19. Similarly, when the government exercises its discretion and approves warnings intended for users, it has an interest in insulating its contractors from state failure to warn tort liability.

> Accordingly, the rationale for applying the government contractor defense to a failure to warn claim tracks the *Boyle* analysis closely. When state law would otherwise impose liability for a failure to warn of dangers in using military equipment, that law is displaced if the contractor can show: (1) the United States exercised its discretion and approved the warnings, if any; (2) the contractor provided warnings that conformed to the approved warnings; and (3) the contractor warned the United

States of the dangers in the equipment's use about which the contractor knew, but the United States did not. As in design defect cases, in order to satisfy the first condition—government "approval"—in failure to warn cases, the government's involvement must transcend rubber stamping. And where the government goes beyond approval and actually determines for itself the warnings to be provided, the contractor has surely satisfied the first condition because the government exercised its discretion. The second condition in failure to warn cases, as in design defect cases, assures that the defense protects the government's, not the contractor's, exercise of discretion. Finally, the third condition encourages frank communication to the government of the equipment's dangers and increases the likelihood that the government will make a well-informed judgment....

... Several of the cases decided in our sister circuits indicate that the contractor must show "that the Government itself 'dictated' the content of the warnings," *In re N.Y. Asbestos*, 897 F.2d at 630 (quoting *Nicholson v. United Technologies Corp.*, 697 F.Supp. 598, 604 (D.Conn.1988)), or that the United States imposed a "prohibition against health warnings," *Dorse*, 898 F.2d at 1489. We reiterate that the FTCA's discretionary function exemption delineates the contours of the defense. Government *discretion* is required, not dictation or prohibition of warnings. Where a contractor proposes warnings that the government substantively approves, and satisfies the second and third conditions, the defense displaces state law—even if the government did not "prohibit" the contractor from proposing more alarming warnings.

*Tate*, 55 F.3d at 1156–57 (parallel citations omitted).

I agree that establishing government dictation or prohibition seems too onerous a burden in light of the reasoning of the *Boyle* Court. Thus, if the undisputed facts show that Oshkosh submitted proposed warnings to the Marine Corps which the Marine Corps subsequently substantively approved and to which the vehicles conformed, then summary judgment in Oshkosh's favor is appropriate, as I have already determined that Oshkosh did not fail to warn the Marine Corps of any dangers associated with the type of fuel used in the MK–48 of which Oshkosh had knowledge but the Marine Corps did not.

With its reply brief, Oshkosh submitted an affidavit of Danny Lanzdorf, Oshkosh's Chief Engineer for the MK–48. Lanzdorf states that among the plans, drawings, and specifications submitted by Oshkosh to the Marine Corps were proposed warnings. Additionally, Lanzdorf states, with supporting exhibits, that the Marine Corps decided to exclude information regarding protection of the fuel tanks from fire or explosion from the Performance Specification for the MK–48. Oliver and Tate have failed to provide any evidence to dispute Lanzdorf's affidavit.[5] Further, I note that Oliver and Tate's argument is that Oshkosh should have warned the Marine Corps specifically against the use of Jet A–1 fuel in the MK–48. As I determined earlier, there is absolutely no evidence to indicate that Oshkosh even considered the possibility of using Jet A–1 fuel in the MK–48. Without knowledge that the Marine Corps planned to use Jet A–1 fuel in the MK–48, it is difficult to see how Oshkosh should have formulated warnings regarding the volatility of the Jet A–1 fuel.

 Incorporating (without repeating) the rather lengthy analysis in which I engaged above, I find that the undisputed facts show that Oshkosh submitted proposed warnings to the Marine Corps which the Marine Corps subsequently approved in part. That approval was not merely a rubber stamp, but the result of an extensive dialogue between Oshkosh and the Marine Corps. The vehicles provided by Oshkosh conformed to the specifications, including those regarding warnings, approved by the Marine Corps. And, finally, Oshkosh did not fail to warn the Marine Corps of any dangers in the use of

---

**5.** Although the substance of Oshkosh's argument was made in its reply brief, I allowed Oliver and Tate to file supplemental briefs with attached exhibits. Oliver and Tate did not address this issue in their supplemental briefs.

the MK–48 that were known to Oshkosh but not to the Marine Corps. Thus, I conclude that Oshkosh has established the government contractor defense against Oliver and Tate's failure-to-warn claims as well.

## III. CONCLUSION

I find that Oshkosh has established each of the elements of the government contractor defense and therefore is entitled to summary judgment as a matter of law. The accident on Khanjar Expressway, which took Lance Corporal Oliver's life and Corporal Tate's leg, was tragic and unfortunate. As Justice Powell wrote in *Harduvel*,[6] however, "Although the defense may sometimes seem harsh in its operation, it is a necessary consequence of the incompatibility of modern products liability law and the exigencies of national defense." 878 F.2d at 1322.

Accordingly,

**IT IS ORDERED** that the motion for summary judgment, filed by the defendant, be and the same is hereby **GRANTED;**

**IT IS FURTHER ORDERED** that the motion for leave to file a supplemental brief in opposition to the motion for summary judgment, filed by the plaintiff, be and the same is hereby **GRANTED;** and

**IT IS FURTHER ORDERED** that the motion to strike the plaintiff's supplemental brief and affidavit in opposition to the motion for summary judgment, filed by the defendant, be and the same is hereby **DENIED;** and

**IT IS FURTHER ORDERED** that the above-captioned matters be and the same are hereby **DISMISSED** with prejudice.

The clerk is directed to enter judgment accordingly.

---

**6.** Justice Powell, retired at the time, sat by designation and wrote the court's opinion.